# EXHIBIT C

United States Patent & Trademark Office
Patent Trial & Appeal Board

---

IRON DOME LLC
Petitioner

v.

CHINOOK LICENSING DE LLC
Patent Owner

---

Petition for Inter Partes Review
of

**Patent No. 7,047,482** (to Gary Odom)
<u>Titled</u>: *Automatic directory supplementation*
<u>Issue date</u>: May 16, 2006

---

For Paralegal:

Number of Claims Challenged = 19
Power of Attorney enclosed
Fee paid online by credit card

Contact: John Yim
Phone: 703.749.0500
Email: jyim@yimassociates.com

# Table of Contents

I.    **Introductory Matters** .................................................................... **- 1 -**

    A.    Relief Requested ........................................................................ - 1 -

    B.    Grounds for Standing ................................................................ - 1 -

    C.    Mandatory Notices .................................................................... - 1 -

II.   **Prior Art References** ...................................................................... **- 3 -**

    A.    The claims have an effective filing date of February 28, 2001 ............ - 3 -

    B.    List of Prior Art ........................................................................ - 3 -

III.  **Technical Background & Claim Construction** .................................... **- 4 -**

    A.    Technical Background of the Challenged Patent ........................... - 4 -

    B.    Claim Construction .................................................................... - 5 -

IV.   **Grounds for Challenge** ................................................................... **- 9 -**

    A.    Chen - primary prior art reference .............................................. - 9 -

    B.    Lieberman - second prior art reference ........................................ - 9 -

V.    **Claim Analysis** ............................................................................. **- 10 -**

    Independent Claim 1 ........................................................................ - 10 -

    Claim 2 .......................................................................................... - 15 -

    Claim 3 .......................................................................................... - 15 -

    Claim 4 .......................................................................................... - 16 -

    Claim 5 .......................................................................................... - 16 -

    Claim 6 .......................................................................................... - 17 -

    Claim 7 .......................................................................................... - 17 -

    Claim 9 .......................................................................................... - 18 -

    Claim 10 ........................................................................................ - 18 -

    Independent Claim 11 ...................................................................... - 19 -

    Claim 12 ........................................................................................ - 23 -

    Claim 13 ........................................................................................ - 23 -

    Claim 14 ........................................................................................ - 24 -

US 7,047,482

Claim 15...................................................................................... - 24 -

1ndependent Claim 16 ...................................................................... - 24 -

Claim 17...................................................................................... - 28 -

Claim 18...................................................................................... - 29 -

Claim 19...................................................................................... - 29 -

Claim 20...................................................................................... - 29 -

## Exhibit List

Exh. 1001   U.S. Patent No. 7,047,482 ('challenged patent')

Exh. 1002   Liren Chen & Katia Sycara, "WebMate: A Personal Agent for Browsing and Searching" in *Proceedings of the Second International Conference on Autonomous Agents.* Sponsored by ACM SIGART in Minneapolis/St. Paul, MN; May 9-13, 1998. Selected pages: Table of Contents, pp. 132-139 ('Chen')

Exh. 1003   Henry Lieberman, "Letizia: An Agent That Assists Web Browsing" in *Proceedings of the Fourteenth International Joint Conference on Artificial Intelligence.* Sponsored by IJCAII in Montréal, Québec, Canada; August 20-25, 1995. Selected pages: Table of Contents, pp. 924-929 ('Lieberman')

Exh. 1004   "BRIEF FOR APPELLANT" dated Feb. 18, 2005 in the prosecution history of the challenged patent ('Appeal Brief')

## Citation Form Used

Reference to supporting documents indicated by "@____."

Citations to U.S. Patents are shown as [column number : line numbers].

Citations to line-numbered documents are shown as [page number : line numbers].

Claim terms are distinguished from other text by "underlining."

## Issue Presented

The challenged patent was recently asserted in patent infringement lawsuits against Facebook, Scribd, Hulu, Pandora, Match.com, and others for operating websites that observe a user's selections and make personalized recommendations for other similar selections (e.g. "other music you may like"). A search of the prior art reveals that the claims of the challenged patent are obvious in view of prior web browsing agents that explore the web and recommend webpages of interest to the user.

## I.  Introductory Matters

IRON DOME LLC ('Petitioner') petitions for *Inter Partes* Review ('IPR') of U.S. Patent No. 7,047,482 ('challenged patent' @Exh. 1001), which is owned by CHINOOK LICENSING DE LLC.

### A. Relief Requested

Petitioner requests cancellation of claims 1-7 and 9-20 (total of 19 claims) of the challenged patent for obviousness under 35 U.S.C. § 103.

### B. Grounds for Standing

Petitioner certifies that the challenged patent is available for IPR and that Petitioner is not barred or estopped from requesting an IPR challenging the patent claims on the grounds identified in this petition.

### C. Mandatory Notices

Real Parties-in-Interest: (1) IRON DOME LLC, a Virginia limited liability company, which is a wholly-owned subsidiary of ROZMED LLC, a Virginia limited liability company; and (2) Steven S. Yu, M.D., an individual residing in Rockville, Maryland and the managing member of ROZMED LLC.

Individual Steven S. Yu, M.D. declares that there are no other parties that are funding this IPR, nor participating in any manner in this IPR; and further that this statement is being made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

US 7,047,482

Related Matters: The challenged patent has been asserted by the patent owner in litigation against several defendants alleging infringement by websites that observe a subscriber's selections and recommend other similar selections to the subscriber. On or about December 20, 2013 and January 20, 2014, the patent owner Chinook Licensing DE LLC filed civil actions 1:13-cv-02077 through 02079, 1:14-cv-00073 through 00077, and 1:14-cv-00105 in the U.S. District Court for Delaware.

Individual Steven S. Yu, M.D. declares that Petitioner is not a party to any of these civil actions, nor has Petitioner been given or taken any direct financial interest relating to the outcome of these civil actions; and further that this statement is being made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Electronic Service: Petitioner consents to service by email at:

jyim@yimassociates.com.

| Lead Counsel | Back-Up Counsel |
|---|---|
| John J. Yim (Reg. No. 47,197)<br>JOHN J. YIM & ASSOCIATES LLC<br>7600 Leesburg Pike<br>East Building, Suite 470<br>Tysons Corner, VA 22043<br>Tel:   703.749.0500<br>Fax:   202.379.1723<br>Email:  jyim@yimassociates.com | Steven S. Yu (Reg. No. 58,776)<br>IRON DOME LLC<br>PO Box 10034<br>Gaithersburg, MD  20898<br>Tel: 202.262.0426<br>Email: syu@irondome.com |

## II.   Prior Art References

### A.  The claims have an effective filing date of February 28, 2001

The challenged patent was granted from application Serial No. 09/796,235 filed on February 28, 2001. This application does not claim priority to any prior-filed applications. Accordingly, the earliest possible effective filing date for the claims of the challenged patent is **February 28, 2001.**[1]

### B. List of Prior Art

The prior art publications referenced herein are as follows.

1. Liren Chen & Katia Sycara, "WebMate: A Personal Agent for Browsing and Searching" in *Proceedings of the Second International Conference on Autonomous Agents.* Sponsored by ACM SIGART in Minneapolis/St. Paul, MN; May 9-13, 1998. Selected pages: Table of Contents, pp. 132-139 ('Chen'; Exh. 1002)[2]

2. Henry Lieberman, "Letizia: An Agent That Assists Web Browsing" in *Proceedings of the Fourteenth International Joint Conference on Artificial Intelligence.* Sponsored by IJCAII in Montréal, Québec, Canada; August 20-25, 1995. Selected pages: Table of Contents, pp. 924-929 ('Lieberman'; Exh. 1003)[3]

---

[1] We reserve the right to dispute whether the challenged claims should legitimately have the benefit of this filing date (i.e. lack of written support).

[2] Chen is an article published in a book distributed to participants at a symposium proceeding in May 1998. The copy held by the Library of Congress in Washington, D.C. is date stamped October 18, 1999. Therefore, Chen is prior art under 35 U.S.C § 102(b).

[3] Lieberman is an article published in a book distributed to participants at a symposium proceeding in August 1995. The copy held by the Georgetown University Libraries in Washington, D.C. is date stamped March 25, 1998. Therefore, Lieberman is prior art under 35 U.S.C § 102(b).

Neither of the above publications were cited in the original prosecution of the challenged patent.

## III.   Technical Background & Claim Construction

### A. Technical Background of the Challenged Patent

The challenged patent (Exh. 1001) describes a computer software program that assists a user in browsing the Internet by making recommendations for webpages that might interest the user (sometimes referred to as a browsing agent). To make these recommendations, the software examines a set of items that the user has selected (e.g. the user's bookmark folder of "favorite" websites) as indicative of the user's field of interest.

FIG. 2 of the challenged patent shows a directory 3 of links or documents (e.g. webpages) that the user has selected and categorized according to a topic as designated by the directory title 5. @3:14-18. The browsing agent applies linguistic analysis techniques to the textual content of the selected items and extracts words that appear to be relevant to the user's field of interest (e.g. by analysis of word frequency, word placement, syntax, etc.). @3:33-36. Extracted keywords are rated or ranked according to such factors as location in the document, prominence, and frequency of appearance. @4:22-33.

This keyword extraction and ranking process is performed on all the items in directory 3 and those that best represent the content of the directory 3 as a whole are

selected as directory keywords 88. @4:63-5:17. Using the directory keywords 88, the browsing agent searches the network for other items having textual content similar to those in directory 3. @5:18-23. The user can set a breadth threshold to widen or narrow the scope of the search. @4:54-62. As shown in FIG. 6, the original directory 3K (the user's interest in the musical group King Crimson) is supplemented with the search results in a new box beneath (directory supplementation 6K). The new links 1F are displayed along with a ranking 66 of their relevance. @5:64-67.

## B. Claim Construction

In the context of an *inter partes* review, claim terms must be given their broadest reasonable interpretation in view of the specification.

### 1. "autonomously" (see claims 10 and 11)

This term relates to how the software operates without direct user participation. This term was added to the claims by amendment during the prosecution of the challenged patent, but it does not appear anywhere in the specification of the challenged patent. However, the challenged patent explains the "automatic" operation of the software agent as follows:

> Directory supplementation 6 may be enabled 10 by default, by software-determined protocol, or by user determination. Automatically supplementing a directory 6 refers to adding links 1 or documents 2 to a directory 3 without a user having to search 12 or manually add links 1 to that directory 3.

@4:35-40. Thus, the term "autonomously" is synonymous with "automatically" and means that the directory supplementation process occurs "without a user having to search [] or manually add links [] to that directory []."

     2.  "without contemporaneous user input" (and variations thereof)

This is another term relating to how the software operates without direct user participation. This term was added to the claims by amendment during the prosecution of the challenged patent, but it does not appear anywhere in the specification of the challenged patent. We therefore turn to the applicant's statements during the prosecution of the challenged patent to understand the meaning of this term. The applicant gave the following explanation in his Appeal Brief:

> So, Examiner … tacitly concurred with appellant, that, in context, the two limitations applicable to the meaning of 'without user input' comprise:
>
> 1. no user input of search parameters;
> 2. no user input of search locations.
>
> That is exactly what appellant had explained in his 08/27/2004 reply to the first office action rejection.

@Appeal Brief 14 top (Exh. 1004). Thus, according to the applicant's statements in the prosecution history, the term "without contemporaneous user input" means that the software works with "no user input of search parameters" and "no user input of search locations."

### 3. "searching as a background operation" (and variations thereof)

This term relates to how the software runs as a background process relative to other processes that the computer may be running. This term was added to the claims by amendment during the prosecution of the challenged patent, but it does not appear anywhere in the specification of the challenged patent. We therefore turn to the applicant's statements during the prosecution of the challenged patent to understand the meaning of this term. The applicant gave the following explanation in his Appeal Brief:

> [The software process in my patent application] is fairly characterized as lazy because time is not of the essence. A user doesn't initiate search: the process works in the background, without arousing expectation of quick results.

@Appeal Brief 2 ¶2nd (Exh. 1004). Thus, according to the applicant's statements in the prosecution history, the term "searching as a background operation" means that the searching operation occurs in the background, simultaneously but with a lower priority to other operations that the computer may be performing.

### 4. "precondition" (claims 10 and 11)

This term relates to the selections made by the user before the software begins its autonomous operation. This term was added to the claims by amendment during the prosecution of the challenged patent, but it does not appear anywhere in the specification of the challenged patent. We therefore turn to the applicant's statements

US 7,047,482

during the prosecution of the challenged patent to understand the meaning of this term. The applicant gave the following summary of his invention in his Appeal Brief:

> [My patent application] describes an autonomous search mechanism, solving the problem of finding similar documents to ones already known without any user effort whatsoever. The only *precondition* to initiating the claimed process is user placement of one or more documents in a file system directory as reference material for guiding the search.
>
> …
>
> As an exemplary use-case scenario, a user browses the web, saving topically-related document links in the same web-favorites folder. Once this *precondition* is met, the claimed invention software kicks in: deriving keywords from the saved documents, thus discerning the topic of interest, then searching for other related documents, resulting in supplementing the directory with newly-found documents – hence the title of [my patent application]: 'automatic directory supplementation'.

@Appeal Brief 2 top (italics added; Exh. 1004). Further clarification of the term "precondition" is given by the manner in which the applicant distinguished his invention over the prior art:

> By contrast, the claimed invention relies solely upon documents in a directory, without relying upon user input. Yes, [in my invention] a user must first put the documents in the directory, but that is a *precondition*; user input is not required for the claimed process to work, unlike [the prior art].

@Appeal Brief 14 ¶6th (italics added).

Thus, according to the applicant's statements in the prosecution history, the

term "precondition" means the selection of items that the user has identified as being of interest and encompasses at least "user placement of one or more documents in a file system directory as reference material for guiding the search" such as "saving topically-related document links in the same web-favorites folder." In the words of the applicant, when the user has performed this step, "this precondition is met."

## IV.   Grounds for Challenge

Petitioner requests cancellation of claims 1-7 and 9-20 of the challenged patent. Claims 1-7 and 9-19 are obvious over Chen alone. Claim 20 is obvious over Chen in view of Lieberman. Claim 8 is not of commercial interest to Petitioner and is therefore omitted from this IPR.

### A. Chen - primary prior art reference

Chen (Exh. 1002) is an article published in 1998 and describes the WebMate software, which is a web browsing agent that automatically learns the user's interest and finds webpages that match the user's interest. @132 L Abstract. WebMate compiles a "personal newspaper" of the recommended webpages. @Id.

### B. Lieberman - second prior art reference

Lieberman (Exh. 1003) is an article published in 1995 and describes the Letizia software, which is a "user interface agent that assists a user browsing the World Wide Web." @924 L Abstract. The software agent infers the user's interest from browsing behavior and explores other items that may interest the user. @Id. Chen specifically

cites to Lieberman as "Related work." @Chen 138 R, #17 (Exh. 1002). Thus, it is appropriate to combine Chen with Lieberman for an obviousness analysis.

## V.   Claim Analysis

The challenged patent has three independent claims, which are claims 1, 11, and 16, all being for a "computer-implemented method," i.e. computer software. In general, all three independent claims are directed to a software agent that automatically ("without contemporaneous user input") finds items (e.g. links or webpages) that match the user's interest and adds them to a directory. A well-known example would be a web browsing agent that analyzes a user's bookmark folder of "favorite" links, searches the Internet for links with similar content, and recommends other links that might be of interest to the user.

### Independent Claim 1

a) (preamble) "A computer-implemented method for augmenting a directory without contemporaneous user input comprising:"

Chen (Exh. 1002) describes the WebMate software agent, which automatically learns a user's interest by extracting keywords from documents selected by the user and "automatically spiding news sources" ("spiding" means crawling the web, as a spider would) on the Internet for webpages having similar content. @Abstract. As explained above, the term "without contemporaneous user input" means that the software works with "no user input of search parameters" and "no user input of

search locations." @IPR 6. More detailed explanation about this and other features of WebMate are given below.

> b) (claim 1) "<u>accessing at least a first document via a first directory without contemporaneous user selection of said first document, said first document comprising at least in part topical textual content</u>"

This claim term is essentially stating that the software agent automatically examines the text in the documents selected by the user (e.g. bookmarked links in a "favorites" folder). In the challenged patent, an example of a "<u>first directory</u>" is given in FIG. 6. @Exh. 1001 p. 6. Here, the directory 3K is titled "King Crimson" and contains links related to this particular musical group. The directory 3K (upper portion) corresponds to the "<u>first directory</u>." As explained above, the software agent analyzes the textual content of the linked pages in this directory for keywords that appear to represent the user's interest. Regarding the claim term "<u>without contemporaneous user selection</u>," the links in directory 3K were previously selected by the user, and the software agent automatically accesses the linked pages in directory 3K.

WebMate works in a similar manner by "learning user interests incrementally and with continuous update and automatically providing documents (e.g. a personalized newspaper) that match the user interests." @132 R ¶bott. WebMate develops the user profile automatically and "unobtrusively" by keyword extraction from documents that the user selects by marking them as "I like it." @132 L Abstract, 134 L mid. The "user can provide multiple pages as similarity/relevance guidance for

the search." @132 L Abstract. Thus, WebMate accesses the user-selected documents "without contemporaneous user selection," which is understood to mean "no user input of search parameters" and "no user input of search locations." @IPR 6.

"In order to save on storage space," WebMate "doesn't keep any of the previous positive example documents." @133 R ¶top. However, storage space is not a concern for higher capacity machines and it would be obvious to keep the set of "I like it" documents selected by the user as a collection of links instead of discarding them. This collection of "I like it" documents selected by the user would constitute a "first directory" recited in the claim. To be explained in detail below, these user-selected documents have "topical textual content."

    c)   (claim 1) "deriving at least one keyword indicative of at least one topical content from said first document"

Once the user has selected the items of interest, WebMate automatically parses the selected web documents and extracts words contained therein, including those in the title and headers. @133 R – 134 L. Using the extracted words, WebMate then constructs a word vector for the document. @133 R ¶2nd. The word vector is an aggregate representation of the content as a series of word elements, each weighted according to its frequency of occurrence in the document. @Id. The combined word vectors become the user profile. @Id.

..

**d)** (claim 1) "<u>searching as a background operation a plurality of documents in storage in at least one computer without contemporaneous user input of a search location, such that said search comprises searching for documents related by said at least one keyword to said first document, thereby accessing a second document</u>"

This claim term is essentially stating that the search for similar documents on the Internet or network occurs as a background process on the computer. With the user's interest profile created, WebMate can search the entire web for pages relevant to the user's interest, or monitor only a selection of websites designated by the user. @134 §3.2. If the user has selected a particular list of websites (URLs) for monitoring, WebMate can search these websites to find relevant webpages based on their similarity to the word vector in the user's profile. @134 L ¶bott. If the user does not provide a list of websites to monitor, then WebMate can simply construct a search query "using the top several words in the current [user] profile and sends it to search engines (e.g. Altavista, Yahoo)." @134 R ¶2nd.

When WebMate is searching selected websites for pages that match the word vector in the user's profile, or searching the entire web using the top words in the user's profile, it is "<u>searching for documents related by said at least one keyword to said first document</u>." The webpages being examined by WebMate constitute a "<u>second document</u>" which are "<u>in storage in at least one computer</u>," i.e. in the computers running the websites.

US 7,047,482

WebMate can perform its search "in the middle of the night when the network traffic is low" such that "[i]n the morning, the user can read the recommended personal newspaper." @134 R top. WebMate can also perform its search contemporaneously "[i]f the result is needed immediately." @Id. R ¶ 2nd. As "Related work," Chen also points to the Letizia web browsing agent which "can recommend nearby pages by doing lookahead search." @138 R top. Thus, Chen discloses three different timeframes in which searching can be performed: (1) overnight during machine idle time, (2) immediately, and (3) as a "lookahead search" while the user is browsing the Internet. All three searching methods are performed "without contemporaneous user input of a search location." Moreover, from these teachings about the different timeframes for performing the search, it would be obvious to have WebMate perform "searching as a background operation" in the same manner as Letizia's "lookahead search."

     e)   (claim 1) "determining relevance of said second document to said at least one keyword"

WebMate decides whether to recommend the pages it has found to the user on the basis of whether the page content "similarity is greater than some threshold" as compared against the user's profile (which is represented by word vectors). @134 L ¶bott. (see also R ¶2nd).

US 7,047,482

f)   (claim 1) "<u>adding a reference to said second document in a results</u>
<u>directory</u>."

If the user has selected websites for monitoring, WebMate can perform the

search overnight and in the morning, provide the user with a "personal newspaper"

listing the recommended pages. @134 L ¶bott. If WebMate performs a web-wide

search, WebMate analyzes the search results and presents those meeting the required

threshold for similarity "in descending order of relevance." @134 R ¶2nd. In both of

the aforementioned situations, WebMate works by "<u>adding a reference to said second</u>

<u>document [i.e. the recommended webpage] in a results directory</u>."

## Claim 2

Claim 2 depends from claim 1 and specifies that "<u>at least part of said storage is</u>

<u>on a different computer than the computer storing said first directory</u>." WebMate

performs a search of the World Wide Web for documents that are relevant to the

user's interest. The World Wide Web is a network of many different computers

throughout the world. For example, Chen describes an experiment with WebMate in

which 14 news sites covering technology news were monitored by WebMate for news

articles matching the user's interest. @134 R ¶3rd. The 14 news sites on the Internet

selected for monitoring are on a "<u>different computer</u>" than the user's computer. @Id.

## Claim 3

Claim 3 depends from claim 1 and adds the step of "<u>deriving a plurality of</u>

<u>keywords</u>." As explained above, WebMate parses through the documents selected by

the user (marked as "I like it") and extracts words from the documents to generate a weighted word vector representing the user's field of interest.

### Claim 4

Claim 4 depends from claim 3 and adds the step of "ranking at least two of said plurality of keywords." As explained above for claim 1(c), WebMate generates a word vector for the words in the document, and each word in the vector is weighted according to its frequency of occurrence. @IPR 12. In addition, WebMate can operate by constructing a search query "using the top several words in the current [user] profile and sends it to popular search engines (e.g. Altavista, Yahoo)." @134 R ¶2nd. In Chen's experimental demonstration of WebMate, the "top 5 words" were used to construct a search query for the Lycos search engine. @138 L ¶3rd. Both of the aforementioned functions, weighting of the words in the word vector or selection of the "top several words," constitutes "ranking at least two of said plurality of keywords."

### Claim 5

Claim 5 depends from claim 1 and adds the step of "accessing a plurality of documents in said first directory." WebMate performs the parsing routine "[f]or each positive example (i.e. an HTML documents [sic] that the user has marked 'I like It')." @133 R ¶5th. Thus, if there are multiple web documents marked by the user as "I like

it," then WebMate will perform the parsing routine on each of the multiple web documents.

### Claim 6

Claim 6 depends from claim 1 and adds the step of "<u>signifying the relevance of said second document to documents in the first directory when displaying said results directory</u>." In the challenged patent, FIG. 6 shows the results directory 6K with the new links 1F displayed along with a ranking 66 of their relevance. @Exhibit 1001 p. 6 (see also 5:64-67).

In WebMate, the "personal newspaper" provided to the user "sorts all the recommended pages in decreasing order of similarity." @134 L ¶bott. Alternatively, if instead WebMate performs a search query, WebMate lists the recommended pages in "descending order of relevance." @ld. R ¶2nd. Moreover, Chen shows the search results returned by the Lycos search engine in one of the experimental demonstrations of WebMate. @138 L ¶3rd. Regarding the Lycos search results shown, the "content of links marked with '*' are similar to the content of the page given as the 'relevant' feedback." @ld. Thus, WebMate performs the step of "<u>signifying the relevance of said second document ... when displaying said results directory</u>."

### Claim 7

Claim 7 depends from claim 1 and adds the step of "<u>comparing the relevance of said second document to a preset threshold</u>." WebMate recommends a webpage to

the user if its "similarity is greater than some threshold." @134 L ¶bott. (see also R ¶2nd).

### Claim 9

Claim 9 depends from claim 1 and adds the step of "displaying said results directory." As explained above for claim 1(f), WebMate can provide the user with a "personal newspaper" listing the recommended pages or present the search results "in descending order of relevance." @IPR 15. This constitutes "displaying said results directory."

### Claim 10

Claim 10 depends from claim 1 and adds the step of "recognizing a precondition for autonomously augmenting said results directory, prior to accessing said first document." As explained above, the term "autonomously" is synonymous with "automatically." @IPR 5. The term "precondition" means the selection of items that the user has identified as being of interest and encompasses at least "user placement of one or more documents in a file system directory as reference material for guiding the search" such as "saving topically-related document links in the same web-favorites folder." @IPR 7.

As explained above, although WebMate does not keep the documents marked "I like it" to save on storage space, it would be obvious to do so if storage space is not a concern. @Chen 133 R ¶top (Exh. 1002), IPR 12. This collection of "I like it"

documents selected by the user would constitute a "<u>precondition.</u>" WebMate analyzes the documents selected by the user (i.e. the "<u>precondition</u>") and automatically finds other webpages for recommending to the user.

### Independent Claim 11

a) (preamble) "<u>A computer-implemented method for augmenting a directory comprising:</u>"

Chen (Exh. 1002) describes the WebMate software agent, which automatically learns a user's interest by extracting keywords from documents selected by the user and "automatically spiding news sources" ("spiding" means crawling the web, as a spider would) on the Internet for webpages having similar content. @Abstract.

b) (claim 11) "<u>autonomously initiating operation based upon a stored precondition</u>"

c) (claim 11) "<u>accessing at least a first document without contemporaneous user selection, wherein said first document comprises at least in part topical textual content</u>"

Claim steps (b) and (c) are taken together because step (b) of autonomously initiating operation of the software causes step (c) of accessing the documents "<u>without contemporaneous user selection.</u>" As explained above, the term "<u>autonomously</u>" is synonymous with "automatically." @IPR 5. The term "<u>precondition</u>" means the selection of items that the user has identified as being of interest and encompasses at least "user placement of one or more documents in a file system directory as reference material for guiding the search" such as "saving topically-related document links in the same web-favorites folder." @IPR 7.

WebMate works by "learning user interests incrementally and with continuous update and automatically providing documents (e.g. a personalized newspaper) that match the user interests." @132 R ¶bott. WebMate develops the user profile automatically and "unobtrusively" by keyword extraction from documents that the user selects by marking them as "I like it." @132 L Abstract, 134 L mid. The "user can provide multiple pages as similarity/relevance guidance for the search." @132 L Abstract. Thus, WebMate access the user-selected documents "without contemporaneous user selection," which is understood to mean "no user input of search parameters" and "no user input of search locations." @IPR 6.

"In order to save on storage space," WebMate "doesn't keep any of the previous positive example documents." @133 R ¶top. However, storage space is not a concern for higher capacity machines and it would be obvious to keep the set of "I like it" documents selected by the user as a collection of links instead of discarding them. This collection of "I like it" documents selected by the user would constitute a "precondition" recited in the claim. To be explained in detail below, these user-selected documents have "topical textual content."

    d)  (claim 11) "deriving at least one keyword indicative of at least one topical content within said first document"

Once the user has selected the items of interest, WebMate automatically parses the selected web documents and extracts words contained therein, including those in the title and headers. @133 R – 134 L. Using the extracted words, WebMate then

constructs a word vector for the document. @133 R ¶2nd. The word vector is an aggregate representation of the content as a series of word elements, each weighted according to its frequency of occurrence in the document. @Id. The combined word vectors become the user profile. @Id.

    e)  (claim 11) "<u>as a background operation, searching in storage in at least one computer for documents related by said at least one keyword to said first document</u>"

With the user's interest profile created, WebMate can search the entire web for pages relevant to the user's interest, or monitor only a selection of websites designated by the user. @134 §3.2. If the user has selected a particular list of websites (URLs) for monitoring, WebMate can search these websites to find relevant webpages based on their similarity to the word vector in the user's profile. @134 L ¶bott. If the user does not provide a list of websites to monitor, then WebMate can simply construct a search query "using the top several words in the current [user] profile and sends it to search engines (e.g. Altavista, Yahoo)." @134 R ¶2nd.

When WebMate is searching selected websites for pages that match the word vector in the user's profile, or searching the entire web using the top words in the user's profile, it is "<u>searching … for documents related by said at least one keyword to said first document</u>." These documents being searched by WebMate are "<u>in storage in at least one computer</u>."

WebMate can perform its search "in the middle of the night when the network traffic is low" such that "[i]n the morning, the user can read the recommended personal newspaper." @134 R top. WebMate can also perform its search contemporaneously "[i]f the result is needed immediately." @Id. R ¶ 2nd. As "Related work," Chen also points to the Letizia web browsing agent which "can recommend nearby pages by doing lookahead search." @138 R top. Thus, Chen discloses three different timeframes in which searching can be performed: (1) overnight during machine idle time, (2) immediately, and (3) as a "lookahead search" while the user is browsing the Internet. From these teachings about the different timeframes for performing the search, it would be obvious to have WebMate perform searching "<u>as a background operation</u>" in the same manner as Letizia's "lookahead search."

    f)   (claim 11) "<u>wherein at least some of said searched documents are independent and not organized in relation to one another</u>"

Chen describes an experiment with WebMate in which 14 news sites covering technology news were monitored by WebMate for news articles matching the user's interest. @134 R ¶3rd. The webpages on these 14 different news sites are "<u>independent</u>" and the webpages at one news site are "<u>not organized in relation</u>" to webpages at another news site.

    g)   (claim 11) "<u>determining relevance of a search-accessed second document to said at least one keyword</u>"

WebMate decides whether to recommend the pages it has found to the user on the basis of whether the page content "similarity is greater than some threshold" as

compared against the user's profile (which is represented by word vectors). @134 L ¶bott. (see also R ¶2nd).

    h)   (claim 11) "adding a reference to said second document in a results directory."

If the user has selected websites for monitoring, WebMate can perform the search overnight and in the morning, provide the user with a "personal newspaper" listing the recommended pages. @134 L ¶bott. If WebMate performs a web-wide search, WebMate analyzes the search results and presents those meeting the required threshold for similarity "in descending order of relevance." @134 R ¶2nd. In both of the aforementioned situations, WebMate works by "adding a reference to said second document [i.e. the recommended webpage] in a results directory."

## Claim 12

Claim 12 depends from claim 11 and specifies that the "storage is on a plurality of computers connected to at least one network." WebMate performs a search of the World Wide Web for documents that are relevant to the user's interest. The World Wide Web is a network of many different computers throughout the world. For example, in Chen's experiments with WebMate, the 14 news sites on the Internet selected for monitoring are on a "plurality of computers" in the World Wide Web network. @134 R ¶3rd.

## Claim 13

Claim 13 depends from claim 11 and adds the steps of "deriving a plurality of

keywords" and "determining relevance of said second document to said plurality of keywords." This claim term is essentially reciting the plural form ("plurality of keywords") of main claim 11, steps (d) and (g). @IPR 20. As already explained, WebMate can extract *multiple* keywords from the user-selected "I like it" documents and compare the searched documents against these multiple keywords.

### Claim 14

Claim 14 depends from claim 11 and adds the step of "comparing the relevance of said second document to a preset threshold." WebMate recommends a webpage to the user if its "similarity is greater than some threshold." @134 L ¶bott. (see also R ¶2nd).

### Claim 15

Claim 15 depends from claim 11 and adds the step of "conditionally adding said reference to said second document depending upon whether said reference to said second document already exists in said results directory." This claim term is essentially stating that the software agent will not add a duplicate entry into the results directory. This is simply a common sense feature and there is nothing inventive about it.

### Independent Claim 16

a) (preamble) "A computer-implemented method for augmenting a directory comprising:"

Chen (Exh. 1002) describes the WebMate software agent, which automatically

learns a user's interest by extracting keywords from documents selected by the user and "automatically spiding news sources" ("spiding" means crawling the web, as a spider would) on the Internet for webpages having similar content. @Abstract.

**b)** (claim 16) "<u>accessing a plurality of grouped documents without contemporaneous user selection initiating said access</u>"

WebMate works by "learning user interests incrementally and with continuous update and automatically providing documents (e.g. a personalized newspaper) that match the user interests." @132 R ¶bott. WebMate develops the user profile automatically and "unobtrusively" by keyword extraction from documents that the user selects by marking them as "I like it." @132 L Abstract, 134 L mid. The "user can provide multiple pages as similarity/relevance guidance for the search." @132 L Abstract. Thus, WebMate accesses the user-selected documents "<u>without contemporaneous user selection</u>," which is understood to mean "no user input of search parameters" and "no user input of search locations." @IPR 6.

"In order to save on storage space," WebMate "doesn't keep any of the previous positive example documents." @133 R ¶top. However, storage space is not a concern for higher capacity machines and it would be obvious to keep the set of "I like it" documents selected by the user as links instead of discarding them. This collection of "I like it" documents selected by the user would constitute a "<u>plurality of grouped documents</u>" recited in the claim.

    **c)** (claim 16) "<u>deriving a plurality of keywords indicative of an</u> <u>aggregate content of said grouped documents</u>"

As already explained above for claim 1(c), WebMate parses the user-selected webpages and generates a weighted word vector using the words contained therein. @IPR 12. The word vector elements are updated with words extracted from additional new documents selected by the user. @134 L ¶top. The final word vector represents the "<u>aggregate content</u>" of the group of documents selected by the user.

    **d)** (claim 16) "<u>prioritizing a relative relevance of said keywords; storing</u> <u>said plurality of keywords with regard to said relevance</u>"

In WebMate, "[e]ach dimension of the vector space represents a word and its weight." @133 R ¶2nd. Each word is weighted according to its frequency of occurrence. @Id. Thus, this assignment of weights to each of the words in the word vector is "<u>prioritizing a relative relevance of said keywords</u>." The words (or dimensional variables representing the words) and their assigned weighting values are stored in the word vector.

    **e)** (claim 16) "<u>searching as a background operation storage in at least</u> <u>one computer for documents related to said plurality of stored</u> <u>keywords</u>"

This claim term is essentially stating that the search for similar documents on the Internet or network occurs as a background process on the computer. With the user's interest profile created, WebMate can search the entire web for pages relevant to the user's interest, or monitor only a selection of websites designated by the user. @134 §3.2. If the user has selected a particular list of websites (URLs) for monitoring,

WebMate can search these websites to find relevant webpages based on their similarity to the word vector in the user's profile. @134 L ¶bott. If the user does not provide a list of websites to monitor, then WebMate can simply construct a search query "using the top several words in the current [user] profile and sends it to search engines (e.g. Altavista, Yahoo)." @134 R ¶2nd.

When WebMate is searching selected websites for pages that match the word vector in the user's profile, or searching the entire web using the top words in the user's profile, it is "searching ... for documents related to said plurality of stored keywords." The webpages being examined by WebMate are in "storage in at least one computer," i.e. on the computers running the websites.

WebMate can perform its search "in the middle of the night when the network traffic is low" such that "[i]n the morning, the user can read the recommended personal newspaper." @134 R top. WebMate can also perform its search contemporaneously "[i]f the result is needed immediately." @Id. R ¶ 2nd. As "Related work," Chen also points to the Letizia web browsing agent which "can recommend nearby pages by doing lookahead search." @138 R top. Thus, Chen discloses three different timeframes in which searching can be performed: (1) overnight during machine idle time, (2) immediately, and (3) as a "lookahead search" while the user is browsing the Internet. From these teachings about the different timeframes for

US 7,047,482

performing the search, it would be obvious to have WebMate perform "searching as a background operation" in the same manner as Letizia's "lookahead search."

   f) (claim 16) "determining relevance of a found second document to said plurality of stored keywords"

WebMate decides whether to recommend the pages it has found to the user on the basis of whether the page content "similarity is greater than some threshold" as compared against the user's profile (which is a word vector). @134 L ¶bott. (see also R ¶2nd).

   g) (claim 16) "conditionally adding a reference to said second document in a results directory."

If the user has selected websites for monitoring, WebMate can perform the search overnight and in the morning, provide the user with a "personal newspaper" listing the recommended pages. @134 L ¶bott. If WebMate performs a web-wide search, WebMate analyzes the search results and presents those meeting the required threshold for similarity "in descending order of relevance." @134 R ¶2nd. In both of the aforementioned situations, WebMate works by "conditionally adding a reference to said second document [i.e. the recommended webpage] in a results directory."

## Claim 17

Claim 17 depends from claim 16 and adds the step of "comparing the relevance of said second document to a preset threshold." WebMate decides to recommend a found page to a user if the "similarity is greater than some threshold." @134 L ¶bott. (see also R ¶2nd).

US 7,047,482

### Claim 18

Claim 18 depends from claim 16 and specifies that the "<u>storage is on a plurality</u> <u>of computers connected to at least one network</u>." WebMate performs a search of the World Wide Web for documents that are relevant to the user's interest. The World Wide Web is a network of many different computers throughout the world. For example, in Chen's experiments with WebMate, the 14 news sites on the Internet selected for monitoring are on a "<u>plurality of computers</u>" in the World Wide Web network. @134 R ¶3rd.

### Claim 19

Claim 19 depends from claim 16 and adds the step of "<u>adding a duplicate</u> <u>reference in said results directory is avoided</u>." This claim term is essentially stating that the software agent will not add a duplicate entry into the results directory. This is simply a common sense feature and there is nothing inventive about it.

### Claim 20

Claim 20 depends from claim 16 and adds the step of "<u>adding a reference that</u> <u>was previously deleted from said results directory is avoided</u>." When a user deletes a reference, that would indicate that the user is no longer interested in that reference. Lieberman (Exh. 1003) suggests how the web browsing agent should handle this. As explained above, Chen specifically cites to Lieberman as "Related work." @Chen 138

US 7,047,482

R, #17 (Exh. 1002). Therefore, someone reading Chen would consider the teachings of Lieberman to be relevant.

Lieberman describes the Letizia software agent, which explores the web for other items that may interest the user. @924 L Abstract (Exh. 1003). Lieberman explains how the user's interest can be inferred from browsing behavior. @925 R §4. Lieberman also considers a user's *disinterest* in a particular item, stating:

> If the user returns immediately without having either saved the target document, or followed further links, an indication of *disinterest* can be assumed. Letizia saves the user considerable time that would be wasted exploring those "dead-end" links.

@925 R ¶3rd (italics added). Lieberman further adds:

> Indications of interest probably ought to have a factor of decaying over time so that the agent does not get clogged with searching for interests that may indeed have fallen from the user's attention. Some actions may have been highly dependent upon the local context, and *should be forgotten* unless they are reinforced by more recent action.

@928 L ¶2nd (italics added).

Thus, Lieberman suggests that the browsing agent should carefully observe the user's behavior for indications of interests as well is *disinterests*. Certainly, if the user expressly shows disinterest in the reference by deleting it ("<u>was previously deleted from said results directory</u>"), then there is no reason to waste the user's time by adding what Lieberman calls "dead-end" links. As Lieberman suggests, interests that

have "fallen from the user's attention … should be forgotten," and accordingly, there

is strong motivation to program WebMate to avoid adding a "reference that was

previously deleted from said results directory."

## Conclusion

For the foregoing reasons, the challenged patent's method of observing a user's

selections and recommending other similar selections to the user is obvious over prior

web browsing agents that explore the web and make personalized recommendations

for other webpages of interest.

JOHN J. YIM & ASSOCIATES LLC

/John J. Yim/
John J. Yim
Reg. No. 47,197
Lead Counsel for Petitioner

## Listing of the Claims in Patent No. US 7,047,482

1.　　A computer-implemented method for augmenting a directory without contemporaneous user input comprising:

　　accessing at least a first document via a first directory without contemporaneous user selection of said first document, said first document comprising at least in part topical textual content;

　　deriving at least one keyword indicative of at least one topical content from said first document;

　　searching as a background operation a plurality of documents in storage in at least one computer without contemporaneous user input of a search location, such that said search comprises searching for documents related by said at least one keyword to said first document, thereby accessing a second document;

　　determining relevance of said second document to said at least one keyword; and

　　adding a reference to said second document in a results directory.


2.　　The method according to claim 1, wherein at least part of said storage is on a different computer than the computer storing said first directory.


3.　　The method according to claim 1, further comprising deriving a plurality of keywords.


4.　　The method according to claim 3, further comprising ranking at least two of said plurality of keywords.


5.　　The method according to claim 1, further comprising accessing a plurality of documents in said first directory.

6.    The method according to claim 1, with the additional step of signifying the relevance of said second document to documents in the first directory when displaying said results directory.

7.    The method according to claim 1, with the additional step of comparing the relevance of said second document to a preset threshold.

8.    The method according to claim 1, wherein said results directory is said first directory.

9.    The method according to claim 1, with the additional step of displaying said results directory.

10.    The method according to claim 1, further comprising recognizing a precondition for autonomously augmenting said results directory, prior to accessing said first document.

11.    A computer-implemented method for augmenting a directory comprising:

autonomously initiating operation based upon a stored precondition;

accessing at least a first document without contemporaneous user selection, wherein said first document comprises at least in part topical textual content;

deriving at least one keyword indicative of at least one topical content within said first document;

as a background operation, searching in storage in at least one computer for documents related by said at least one keyword to said first document, wherein at least some of said searched documents are independent and not organized in relation to one another;

determining relevance of a search-accessed second document to said at least one keyword; and

adding a reference to said second document in a results directory.

US 7,047,482

12.    The method according to claim 11, wherein said storage is on a plurality of computers connected to at least one network.

13.    The method according to claim 11, further comprising:

deriving a plurality of keywords; and

determining relevance of said second document to said plurality of keywords.

14.    The method according to claim 11, further comprising comparing the relevance of said second document to a preset threshold.

15.    The method according to claim 11, further comprising conditionally adding said reference to said second document depending upon whether said reference to said second document already exists in said results directory.

16.    A computer-implemented method for augmenting a directory comprising:

accessing a plurality of grouped documents without contemporaneous user selection initiating said access;

deriving a plurality of keywords indicative of an aggregate content of said grouped documents;

prioritizing a relative relevance of said keywords;

storing said plurality of keywords with regard to said relevance;

searching as a background operation storage in at least one computer for documents related to said plurality of stored keywords;

determining relevance of a found second document to said plurality of stored keywords;

conditionally adding a reference to said second document in a results directory.

US 7,047,482

17.     The method according to claim 16, with the additional step of comparing the relevance of said second document to a preset threshold.

18.     The method according to claim 16, wherein said storage is on a plurality of computers connected to at least one network.

19.     The method according to claim 16, wherein adding a duplicate reference in said results directory is avoided.

20.     The method according to claim 16, wherein adding a reference that was previously deleted from said results directory is avoided.

US 7,047,482

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Petition for *Inter Partes* Review of Patent No. 7,047,482 and associated Exhibits 1001-1004 were served on _____, via FedEx courier to the following addresses:

Eugenio Torres-Oyola
Ferraiuoli LLC
221 Ponce De Leon Ave., 5th Floor
San Juan, Puerto Rico 00917
*Patent owner's correspondence address of record*

Stephen B. Brauerman
Bayard, P.A.
222 Delaware Avenue, Suite 900
Wilmington, DE 19899
*Additional address likely to effect service*


John J. Yim & Associates LLC

/John J. Yim/
John J. Yim
Reg. No. 47,197
Lead Counsel for Petitioner

# Exh. 1001



US007047482B1

(12) **United States Patent**
Odom

(10) Patent No.: **US 7,047,482 B1**
(45) Date of Patent: **May 16, 2006**

(54) **AUTOMATIC DIRECTORY SUPPLEMENTATION**

(76) Inventor: **Gary Odom**, 15505 SW. Bulrush La., Tigard, OR (US) 97223

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 623 days.

(21) Appl. No.: **09/796,235**

(22) Filed: **Feb. 28, 2001**

(51) Int. Cl.
*G06F 7/76* (2006.01)
*G06F 17/21* (2006.01)

(52) U.S. Cl. ............................... 715/500; 707/5; 707/3

(58) Field of Classification Search ............ 715/501.1, 715/500; 707/3, 5; 709/202
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,535,382 A | 7/1996 | Ogawa | |
| 5,598,557 A | 1/1997 | Doner | |
| 5,680,511 A | 10/1997 | Baker | |
| 5,893,092 A * | 4/1999 | Driscoll | 707/5 |
| 6,100,890 A * | 8/2000 | Bates et al. | 715/826 |
| 6,122,647 A | 9/2000 | Horowitz | 707/513 |
| 6,138,157 A | 10/2000 | Welter | 709/224 |
| 6,182,133 B1 | 1/2001 | Horvitz | 709/223 |
| 6,184,886 B1 | 2/2001 | Bates | 345/357 |
| 6,480,853 B1 * | 11/2002 | Jain | 707/5 |
| 6,493,702 B1 * | 12/2002 | Adar et al. | 707/3 |

| | | | |
|---|---|---|---|
| 6,584,468 B1 | 6/2003 | Gabriel | |
| 2001/0039563 A1 * | 11/2001 | Tian | 709/202 |
| 2003/0195877 A1 * | 10/2003 | Ford et al. | 707/3 |

OTHER PUBLICATIONS

Maglio, Paul et al., Communications of the ACM, vol. 43, No. 8; "Intermediaries Personalize Information Streams" (Aug. 2000).*
Lieberman, Henry et al., Communications of the ACM, vol. 44, No. 8; "Exploring the Web with Reconnaissance Agents" (Aug. 2001).*
Balabanovic, Marko et al., Communications of the ACM, vol. 30, No. 3; "Content-Based, Collaborative Recommendation" Mar. 1997).*
Geisler, Gary et al., JCDL '01 in Roanoke, Virginia; "Developing Recommendation Services for a Digital Library with Uncertain and Changing Data" (Jun. 24-28, 2001).*
Grasso, Antonietta et al., GROUP 99 in Phoenix, Arizona; "Augmenting Recommender Systems by Embedding Interfaces into Practices" (1999).*
Voss, Angi et al., GROUP 99 in Phoenix, Arizona; "Concept Indexing" (1999).*

* cited by examiner

*Primary Examiner*—Doug Hutton

(57) **ABSTRACT**

The present invention is computer software that automatically finds, saves, and displays links to documents topically related to document links residing in a directory without a user having to search.

**20 Claims, 5 Drawing Sheets**



Iron Dome, Exh. 1001



FIGURE 1



**FIGURE 2**



**FIGURE 3**

**FIGURE 4**



FIGURE 5



FIGURE 6

US 7,047,482 B1

1

## AUTOMATIC DIRECTORY SUPPLEMENTATION

### TECHNICAL FIELD

The present invention relates generally to information retrieval systems, and more particularly, to automatically finding and displaying related document links without user-initiated searching.

### BACKGROUND OF THE INVENTION

The Internet has become the world's information retrieval system. One of the distinguishing features of Internet (and intranet) documents is the use of embedded document links. Such a link is a portion of a source document that links to a target document: another document, or a different section of the same document. The other document may be on any computer system on a network supporting the appropriate communication protocols. Selecting a link navigates from the source document to the target document.

A web site is a collection of linked documents accessible through the World Wide Web, a part of the Internet. Such documents are commonly called web pages. Typically a web site has a "home page" that is the entry document into the site. The World Wide Web is commonly referred to as "the web".

Web pages commonly use a description language such as HTML (hypertext markup language) or XML (extensible markup language) to embed links and provide document formatting.

A link on a web page is by convention expressed as a uniform resource locator (URL). A link is often associated with a word or phrase in a source document, hence the common nomenclature: hypertext link. But a link may also be associated with images, or controls such as buttons, menus, and the like.

A web browser is a program for displaying web pages. Examples of popular web browsers include Microsoft Internet Explorer and Netscape Navigator.

Web browsers allow users to create and maintain directories of web page links. Such directories are commonly represented as folders or, sometimes, tabs.

New web pages or web sites are commonly found by links in known documents, or by keyword search. Users typically topically group links to related documents in self-titled directories, the directory title being the common topic of links within it.

Web sites are often extensive enough (so many pages) that a site typically offers a search facility for the site; commercial web sites almost always offer site search. Search refers to inquiry based upon one or more keywords (search terms). Search engines that search a multitude of sites abound on the web. A good search engine provides a commercial advantage. Some search engines, and some commercial products, such as Copernic® from Copernic Technologies, tap into multiple search engines to conglomerate searches.

Based upon keywords, quality search engines glean the most probably related pages using a confluence of linguistic analysis methods. Word location analysis is based upon the assumption that the topic of a document is specified in the title, headings, or the early paragraphs of text. Word frequency analysis counts the number of times search terms appear in a document. Syntactic analysis processes the grammatical structure of a document, serving to indicate nouns and verbs. Semantic analysis interprets the contextual meaning of words by examining word relationships. Mor-

2

phological analysis reduces verbs and nouns to their base form, providing a basis for direct word matching. At least one commercial product, LinguistX® from Inxight Software, provides advanced natural language text analysis.

In spite of software sophistication, as every experienced web user knows, user-initiated keyword search can be vexing: searches commonly return a plethora of pages, many unrelated to the desired topic. Search for 'watch', for example, thinking time pieces, and you'll likely end up with a bushel of pages about voyeurism. Careful application of search terms yields more relevant links, but the process and results are problematic: beyond searching for "this 'and' that", search Boolean logic is not exactly intuitive; different search engines have different syntaxes for search Boolean logic, and different ways to apply it, making that bit of business even less amenable; a bit of search pruning still leaves an abundance of junk, while a search result leaving out the chaff probably leaves out a good bit of wheat too.

The technology of document linking, search, and software-based linguistic analysis are well established. Recent advances enhance utility in locating desired information. For example, the subject of U.S. Pat. No. 6,122,647 is dynamically linguistically analyzing the text of a user-selected portion of a target document and generating new links to related documents. The subject of U.S. Pat. No. 6,184,886 is allowing a user to generate and maintain a list of prioritized bookmarks (links) that allow later access to selected sites (documents). The subject of U.S. Pat. No. 6,182,133 is pre-fetching pages for later viewing, thus saving a user time retrieving documents.

### SUMMARY OF THE INVENTION

The present invention automatically finds, saves, and displays links to documents topically related to a set of documents without a user having to search or specify search terms. An incidental aspect of the invention is automatically signifying links by their status.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of computers suitable for practicing the invention.

FIG. 2 depicts a directory of links.

FIG. 3 depicts a document.

FIG. 4 depicts the process to derive keywords from a document.

FIG. 5 depicts the directory supplementation process.

FIG. 6 depicts an example of directory supplementation.

### DETAILED DESCRIPTION OF THE INVENTION

FIG. 1 is a block diagram of a computer 50 connected to a network computer 60 through a network 68. A computer 50 comprises at least a CPU 51; storage 52, which comprises memory 53 and optionally one or more devices with retention medium(s) 54 such as hard disks, diskettes, compact disks, or tape; an optional display device 55; and optionally one or more input devices 56, examples of which include but are not exclusive to, a keyboard 58, and/or one or more pointing devices 57, such as a mouse. A computer 50 also optionally includes a device for connection to a network 59. A network computer 60 comprises at least a CPU 51; storage 52, which comprises memory 53 and optionally one or more devices with retention medium(s) 64 such as hard disks, diskettes, compact disks, or tape; and a device for connec-

Exh. p. 7

US 7,047,482 B1

3

tion to a network 59. In one embodiment, a computer 50 is a client to a network computer 60 that is a server. A client-server environment is a setup whereupon one or more clients 50 are connected to one or more servers 60 through a network 68. A client 50 in a client-server environment primarily receives data. A server 60 primarily transmits data to be received by one or more clients 50. A peer-to-peer network is a setup whereupon one or more computers 50 are connected to one another 69 with or without a server on the network 68. A computer 50 in a peer-to-peer environment shares data with other computers 60. A network 68 may be any means by which one or more computers 50 are connected to one or more other computers 60 for data transfer.

As depicted in FIG. 2, a directory 3, if not empty, comprises a set of documents 2, or a set of links 1 to documents 2, or a combination of documents 2 and links 1. A link 1 is a reference to a document 2. A user-determined directory title 5 may provide concise topic indication.

FIG. 3 depicts a document 2 to which a link 1 may refer, and document 2 components. A document 2 comprises at least a passage of text 22, and may optionally include one or more titles 20, section headings 21, or adjunctive text such as media titles 23T or captions 23C. A document 2 may comprise other components besides text, such as media objects. A media object is a non-text software entity, examples of which include a picture, video, or sound. Text related to a media object is media text 23.

FIG. 4 depicts keyword derivation 9. A keyword 8 is one or more words used as an indication of the contents of a document. A keyword 8 may be a combination of words: for example, the Grateful Dead are significantly different than being either grateful or dead.

Various linguistic analysis methods may be applied to documents 2 for keyword 8 derivation: lexical, word frequency, word placement, syntactic, semantic, or morphological. Such methods are known to those skilled in the art.

Automatically displaying a link 1 refers to displaying a link 1 of a found document 2 without a user having to manually add a link 1 to a directory 3.

Signifying a link 66 refers to visibly indicating the current status of a link 1. Examples of visible indication include color coding or other visible distinction of link 1 text, such a font style; or striking icon 4: either the usual icon 4 color coded, or icons 4 indicating status. Examples of status include a newly found link 1, a level of relevance for a newly discovered link 1, or an obsolete link 13.

Attempting to retrieve a document 2 from a link 1 sometimes reveals that the link 1 is no longer valid: the document 2 is gone, having been moved or removed. In this instance, the link 1 should be signified 66 as obsolete 13 if its document 2 has certainly been removed, or, if a link 1 to a moved document 2 can be ascertained, the stored link 1 should be updated to reflect the new document's 2 location. Pages 2 or sites that have moved often temporarily leave a notice behind telling where the site or page 2 has moved to. In such an instance, software linguistic analysis of the notification can glean the new link 1.

Document 2 inaccessibility does not necessarily mean link obsolescence 13: other possible causes exist, such as, for example, temporary server problems at the document's 2 home site. A link 1 should be signified 66 obsolete 13 only if document 2 removal can be verified: inaccessibility over a prolonged period of time would be indicative. For example, by keeping track of attempted access times, link obsolescence 13 may be concluded given document 2 inaccessibility at different times of the day for over a period of a week or so. Sometimes, document 2 removal is noted on

4

a web page 2. In such an instance, software linguistic analysis of the notification can determine document 2 removal.

Titles 20, including document title 20D, and associated page properties title for web pages 20P, media object titles 23T, and headings (section titles) 21 are prime fodder for keywords. For a document 2 with a link 1, the link title 7 should also be considered for keyword derivation 9. Titles may be considered highly indicative of document topics/ keywords 8. Likewise document headings 21, which can be identified by location, possibly font formatting, and isolation from body text 22; headings 21 in HTML documents are most always distinguished by font formatting, hence, easily identified.

Body text 22 may provide the bulk of information upon which keywords 8 are derived 9. A common technique is to highly regard the first paragraph of body text 22 (and the body text 22 immediately following headings 21) for keyword derivation 9, as the topic of a document 2 or section is typically revealed in the first paragraph (academically known as the "topic paragraph").

Once a document 2 has been analyzed and keywords discerned 9D, document 2 keywords 8 can be rated or ranked 9P. Factors esteeming a keyword 8 include the following: prominence and frequency primarily in titles 20 and secondarily in headings 21; prominence and frequency in topic paragraphs and media text 23. Otherwise, word frequency may be a primary keyword 8 indicator. A suggested method to rank keywords 9P is to use a point system to weigh relative prominence and frequency, where, for example, prominence may comprise two-thirds of a keyword's 8 score and frequency one-third. Keyword 8 relevancy rating schemes 9P are known to those skilled in the art.

FIG. 5 depicts the directory supplementation 6 process. Directory supplementation 6 must be enabled 10. Directory supplementation 6 may be enabled 10 by default, by software-determined protocol, or by user determination. Automatically supplementing a directory 6 refers to adding links 1 or documents 2 to a directory 3 without a user having to search 12 or manually add links 1 to that directory 3.

Optionally, a breadth threshold level may be set 101. A breadth threshold level is intended as user-determined setting that possibly adjusts the number and potential relevance of accepted documents 2. Greater breadth casts a wider net: more links 1 or documents 2 are retained, and vice versa. If a user desires closely related documents 2 as a product of directory supplementation 6, set a low breadth level 101.

A relation threshold level would the mirror image equivalent to a breadth threshold level 101: a higher setting would be indication to limit directory supplementation 6 to closely related documents 2, and vice versa. Level indication 101 may be ordinal or numeric, such as percentage.

In an embodiment where breadth level setting 101 is employed, the setting 101 may be applied before and/or after search 12. A search 12 may use a broader setting 101 than the user specified. If then directory supplementation 6 presents sparse results, a user may want to adjust to a broader setting 101: if broader documents 2 have already been retrieved, the outcome of a broadened search may appear to the user immediately (with presentation of additional links 1).

Documents 2 in a directory 3 are analyzed 9 for keywords 8. Derived keywords 8 and attendant data may be stored to avoid repetition of the process 9. Attendant keyword data 8 may include keyword 8 rating data, such as keyword frequency and prominence in a document 2.

US 7,047,482 B1

| 5 | 6 |

Though titles are necessarily terse, that very terseness makes directory 5 and link titles 7 an esteemed source of keywords 8. If directories 3 are hierarchical, topical information regarding a nested (lower level) directory 3 may be gleaned 110 by looking up the directory title 5 hierarchy. Title-derived 110 keywords 8 may be given the highest regard.

The final step in keyword collation 11 is ranking 112 the gleaned sets of keywords 8 from directory 3 documents 2 by cumulating and collating keywords 11. This is, in essence, a way of comparing documents via their derived keywords 8. If a document's 2 keywords 8 vary markedly from other documents 2 in its directory 3, that document's 2 keywords 8 may be disregarded. The outcome is a set of directory keywords 88 which may retained, along with attendant data or intermediate results, to avoid unnecessary repetition of the directory keyword collation process 11.

A Boolean logic search 12 for relevant documents 2 throughout all or part of a computer's or network storage (52, 62) proceeds based upon directory keywords 88. Candidate documents 2 may be found using cursory search 120 techniques, as winnowing may occur after documents 2 are found.

Once candidate documents 2 are found 120, links 1 to pages 2 or sites previously eliminated from the target directory 3 may be culled 86. The obvious implication is that to perform this function, previously deleted links 1 from a directory 3 must be remembered (though no longer displayed). Culling discarded links 86, though optional, is highly recommended, as not doing so degrades utility: making a user discard the same links 3 repeatedly would annoy the user.

Candidate document 2 keywords 8 are derived 9, then compared 121 to directory keywords 88. Unlike keyword collation 11, where keywords 8 may be incorporated (albeit on a prioritized basis), candidate document keyword comparison 121 to directory keywords 88 is a critical fitness evaluation which provides the basis for ranking candidate documents 122 for directory supplementation 6. A variety of methods for rating found documents 122 for relevance 33 to target keywords 88 are known to those skilled in the art.

Links 1 to pages 2 on the same site may be collated into a single link 1. This may be done after analyzing the pages 2 to determine the page 2 most closely related 33 to the desired information. As a result, the selected link 1 for supplementation 6 may be the site's home page 2, the top-most page 2 for that topical aspect of the site, or the particular page 2 with the most relevant information. A standout page 2 should not be hidden: in the instance of a fairly relevant site with a spot-on page 2, the smart choice is to use both.

Finally, in the preferred embodiment, the target directory 3 is supplemented 6 with links 1, concomitant to breadth level setting 101 if employed. Optionally, visibly signify links 66 to indicate relevance 33. In an alternate embodiment, the target directory 3 is supplemented 6 with newly found documents 2 in a manner similar to the preferred embodiment.

FIG. 6 depicts an example directory 3κ of links relating to the musical group King Crimson. The top section of the directory 3κ shows existing links 1κ. During the process of checking known linked documents 2 to derive 9 keywords 8, the "Krusty King Crimson" link is found obsolete 13, and visibly signified as such. The bottom section of the directory 3κ illustrates directory supplementation 6κ. In the depicted example, three newly discovered links 1F are displayed, along with indication 66 of their respective relevance 33. If

a user had specified via breadth level setting 101 only displaying links 1 level 2 or better, the "King Crimson Live!" link 1F would not be displayed.

The invention claimed is:

1. A computer-implemented method for augmenting a directory without contemporaneous user input comprising:
   accessing at least a first document via a first directory without contemporaneous user selection of said first document, said first document comprising at least in part topical textual content;
   deriving at least one keyword indicative of at least one topical content from said first document;
   searching as a background operation a plurality of documents in storage in at least one computer without contemporaneous user input of a search location, such that said search comprises searching for documents related by said at least one keyword to said first document, thereby accessing a second document;
   determining relevance of said second document to said at least one keyword; and
   adding a reference to said second document in a results directory.

2. The method according to claim 1, wherein at least part of said storage is on a different computer than the computer storing said first directory.

3. The method according to claim 1, further comprising deriving a plurality of keywords.

4. The method according to claim 3, further comprising ranking at least two of said plurality of keywords.

5. The method according to claim 1, further comprising accessing a plurality of documents in said first directory.

6. The method according to claim 1, with the additional step of signifying the relevance of said second document to documents in the first directory when displaying said results directory.

7. The method according to claim 1, with the additional step of comparing the relevance of said second document to a preset threshold.

8. The method according to claim 1, wherein said results directory is said first directory.

9. The method according to claim 1, with the additional step of displaying said results directory.

10. The method according to claim 1, further comprising recognizing a precondition for autonomously augmenting said results directory, prior to accessing said first document.

11. A computer-implemented method for augmenting a directory comprising:
   autonomously initiating operation based upon a stored precondition;
   accessing at least a first document without contemporaneous user selection, said first document comprises at least in part topical textual content;
   deriving at least one keyword indicative of at least one topical content within said first document;
   as a background operation, searching in storage in at least one computer for documents related by said at least one keyword to said first document, wherein at least some of said searched documents are independent and not organized in relation to one another;
   determining relevance of a search-accessed second document to said at least one keyword; and
   adding a reference to said second document in a results directory.

12. The method according to claim 11, wherein said storage is on a plurality of computers connected to at least one network.

US 7,047,482 B1

7

13. The method according to claim 11, further comprising:
    deriving a plurality of keywords; and
    determining relevance of said second document to said plurality of keywords.

14. The method according to claim 11, further comprising comparing the relevance of said second document to a preset threshold.

15. The method according to claim 11, further comprising conditionally adding said reference to said second document depending upon whether said reference to said second document already exists in said results directory.

16. A computer-implemented method for augmenting a directory comprising:
    accessing a plurality of grouped documents without contemporaneous user selection initiating said access;
    deriving a plurality of keywords indicative of an aggregate content of said grouped documents;
    prioritizing a relative relevance of said keywords;
    storing said plurality of keywords with regard to said relevance;

8

    searching as a background operation storage in at least one computer for documents related to said plurality of stored keywords;
    determining relevance of a found second document to said plurality of stored keywords;
    conditionally adding a reference to said second document in a results directory.

17. The method according to claim 16, with the additional step of comparing the relevance of said second document to a preset threshold.

18. The method according to claim 16, wherein said storage is on a plurality of computers connected to at least one network.

19. The method according to claim 16, wherein adding a duplicate reference in said results directory is avoided.

20. The method according to claim 16, wherein adding a reference that was previously deleted from said results directory is avoided.

\*   \*   \*   \*   \*

# Exh. 1002

# Proceedings of the
# Second International Conference on
# *Autonomous Agents*

## Minneapolis/St. Paul, MN USA
## May 9-13, 1998

Edited by Katia P. Sycara and Michael Wooldridge

LIBRARY OF CONGRESS
OCT 1 8 1999
COPY
COPYRIGHT OFFICE
H

Sponsored by ACM SIGART.

Co-sponsored by ACM/SIGGRAPH and ACM/SIGCHI, with support from Microsoft, Nokia, Sun Microsystems, British Telecom, Mitsubishi Electric ITA (MERL and Horizon Systems Laboratory), SONY, AT&T, and the University of Minnesota.
Held in cooperation with AAAI.

Iron Dome, Exh. 1002

The Association for Computing Machinery
1515 Broadway
New York New York 10036

Copyright 1998 by the Association for Computing Machinery, Inc.(ACM). Permission to make digital or hard copies for personal or classroom use is granted without fee provided that the copies are not made or distributed for profit or commercial advantage and that copies bear this notice and the full citation on the first page.  Copyrights for components of this work owned by others than ACM must be honored.  Abstracting with credit is permitted. To copy otherwise, to republish, to post on servers or to redistribute to lists requires prior specific permission and/or a fee. Request permission to republish from: Publications Dept. ACM, Inc. Fax +1 (212) 869-0481 or <permissions@acm.org> For other copying of articles that carry a code at the bottom of the first or last page. copying is permitted provided that the per-copy fee indicated in the code is paid through the Copyright Clearance Center. 222 Rosewood Drive. Danvers. MA 01923.

ACM ISBN: 0-89791-983-1

Additional copies may be ordered prepaid from:

**ACM Order Department**
PO Box 12114
Church Street Station
New York., NY 10257

Phone: 1-800-342-6626
(US and Canada)
+1-212-626-0500
(all other countries)
Fax: +1-212-944-1318
E-mail: acmpubs@acm.org

ACM Order Number: 605981
Printed in the USA



LC Control Number

00 500668

sn 98-23033

# CONTENTS

ix   **Introduction**
Katia P. Sycara, Conference Chair
Michael Wooldridge, Program Co-Chair

x   **Conference Organization/Sponsors**

xi   **Program Committee**

## PAPER SESSION 1: AGENTS AT THE INTERFACE
Monday, May 11        10:30 am - 12:30 pm

1   Using Explicit Requirements and Metrics for Interface Agent User Model Correction
Scott M. Brown, Air Force Institute of Technology
Eugene Santos Jr., University of Connecticut
Sheila B. Banks, Air Force Institute of Technology
Mark E. Oxley, Air Force Institute of Technology

8   Animated Autonomous Personal Representatives
Timothy W. Bickmore, FX Palo Alto Laboratory
Linda K. Cook, ISAI
Elizabeth F. Churchill, FX Palo Alto Laboratory
Joseph W. Sullivan, FX Palo Alto Laboratory

16   Real-Time Decision Making in Multimodal Face-to-Face Communication
Kristinn R. Thórisson, Massachusetts Institute of Technology

24   Do the Thing Right: An Architecture for Action-Expression
Phoebe Sengers, Carnegie Mellon University

## PAPER SESSION 2: ROBOTICS
Monday, May 11        10:30 am - 12:30 pm

32   From Theory to Practice: The UTEP Robot in the AAAI 96 and AAAI 97 Robot Contests
C. Baral, University of Texas at El Paso
L. Floriano, University of Texas at El Paso
A. Hardesty, University of Texas at El Paso
D. Morales, University of Texas at El Paso
M. Nogueira, University of Texas at El Paso
T. C. Son, University of Texas at El Paso

39   Multi-Robot Path-Planning Based on Implicit Cooperation in a Robotic Swarm
Guillaume Beslon, INSA/IF - PRISMa
Frédérique Biennier, INSA/IF - PRISMa
Béat Hirsbrunner, IIUF-PAI

47   Frontier-Based Exploration Using Multiple Robots
Brian Yamauchi, Naval Research Laboratory

54   Reconfigurable Physical Agents
Masahiro Fujita, Sony Corporation
Hiroaki Kitano, Sony Computer Science Laboratory
Koji Kageyama, Sony Corporation

## PAPER SESSION 3: COORDINATION & COOPERATION
Monday, May 11        10:30 am - 12:30 pm

62   Coordinating with Obligations
Mihai Barbuceanu, University of Toronto
Tom Gray, Mitel Corporation
Serge Mankovski, Mitel Corporation

70   Markov Tracking for Agent Coordination
Richard Washington, Coelum Research, NASA Ames Research Center

78   The CMUnited-97 Robotic Soccer Team: Perception and Multiagent Control
Manuela Veloso, Carnegie Mellon University
Peter Stone, Carnegie Mellon University
Kwun Han, Carnegie Mellon University

86   Using Decision Tree Confidence Factors for Multi-Agent Control
Peter Stone, Carnegie Mellon University
Manuela Veloso, Carnegie Mellon University

## PAPER SESSION 4: ENGINEERING AGENT SYSTEMS I
Monday, May 11        2:00 pm - 3:30 pm

92   Patterns of Intelligent and Mobile Agents
Elizabeth A. Kendall, Royal Melbourne Institute of Technology
P. V. Murali Krishna, Royal Melbourne Institute of Technology
Chirag V. Pathak, Royal Melbourne Institute of Technology
C. B. Suresh, Royal Melbourne Institute of Technology

100   JAFMAS: A Multiagent Application Development System
Deepika Chauhan, University of Cincinnati
Albert D. Baker, University of Cincinnati

108   Agent Design Patterns: Elements of Agent Application Design
Yariv Aridor, IBM Tokyo Research Laboratory
Danny B. Lange, General Magic Inc.

Exh. p. 3

## PAPER SESSION 5: WWW AGENTS I
Monday, May 11                                 2:00 pm - 3:30 pm

116   CiteSeer: An Autonomous Web Agent for
      Automatic Retrieval and Identification of
      Interesting Publications
      Kurt D. Bollacker, *University of Texas at Austin and NEC
      Research Institute*
      Steve Lawrence, *NEC Research Institute*
      C. Lee Giles, *NEC Research Institute and University of
      Maryland*

124   Query Restart Strategies for Web Agents
      Prasad Chalasani, *Carnegie Mellon University*
      Somesh Jha, *Carnegie Mellon University*
      Onn Shehory, *Carnegie Mellon University*
      Katia Sycara, *Carnegie Mellon University*

132   WebMate: A Personal Agent for Browsing
      and Searching
      Liren Chen, *The Robotics Institute, Carnegie Mellon
      University*
      Katia Sycara, *The Robotics Institute, Carnegie Mellon
      University*

## PANEL SESSION
Monday, May 11                                 2:00 pm - 3:30 pm
Session Chair: Andrew Stern, *PF. Magic*

140   AUTONOMOUS AGENTS IN ENTERTAINMENT
      Joe Bates, *Carnegie Mellon University*
      Bruce Blumberg, *MIT Media Lab*
      Athomas Goldberg, *NYU Media Research Laboratory*
      Barbara Hayes-Roth, *Stanford University*
      Andrew Stem, *PF. Magic*

## PAPER SESSION 6: AGENTS FOR
## INFORMATION MANAGEMENT I
Monday, May 11                                 4:00 pm - 5:30 pm

141   Concept Features in Re: Ageot, an
      Intelligent Email Agent
      Gary Boone, *Georgia Institute of Technology*

149   Agents for Collecting Application Usage
      Data Over the Internet
      David M. Hilbert , *University of California, Irvine*
      David F. Redmiles, *University of California, Irvine*

157   Adaptive Information Agents in Distributed
      Textual Environments
      Filippo Menczer, *University of California, San Diego*
      Richard K. Belew, *University of California, San Diego*

## PAPER SESSION 7: SYNTHETIC AGENTS
Monday, May 11                                 4:00 pm - 5:30 pm

165   A Social-Psychological Model for Synthetic
      Actors
      Daniel Rousseau, *Machina Sapiens*
      Barbara Hayes-Roth, *Stanford University*

173   Agents in Annotated Worlds
      Patrick Doyle, *Stanford University*
      Barbara Hayes-Roth, *Stanford University*

181   *Story-morphing* in the Affective Reasoning
      Paradigm: Generating Stories Semi-
      Automatically for Use with "Emotionally
      Intelligent" Multimedia Agents
      Clark Elliott, *DePaul University*
      Jacek Brzezinski, *DePaul University*
      Sanjay Sheth, *DePaul University*
      Robert Salvatoriello, *DePaul University*

## PANEL SESSION
Monday, May 11                                 4:00 pm - 5:30 pm
Session Chair: Hyacinth S. Nwana, *BT Labs*

189   AGENT-MEDIATED ELECTRONIC
      COMMERCE: ISSUES, CHALLENGES AND
      SOME VIEWPOINTS
      Hyacinth S. Nwana, *BT Labs*
      Jeff Rosenschein, *Hebrew University*
      Tuomas Sandholm, *Washington University*
      Carles Sierra, *IIIA*
      Pattie Maes, *MIT Media Laboratory*
      Rob Guttmann, *MIT Media Laboratory*

## PAPER SESSION 8: MOBILE SOFTWARE
## AGENTS
Tuesday, May 12                              10:30 am - 12:30 pm

197   Market-Based Resource Control for Mobile
      Agents
      Jonathan Bredin, *Dartmouth College*
      David Kotz, *Dartmouth College*
      Daniela Rus, *Dartmouth College*

205   Mobile Agents for Enabling Mobile User
      Aware Applications
      Akhil Sahai, *INRIA-IRISA*
      Christine Morin, *INRIA-IRISA*

212   A Secure Marketplace for Mobile Java
      Agents
      Kay Neuenhofen, *Sun Microsystems*
      Matthew Thompson, *Sun Microsystems*

219   Mobile Agents on the Digital Battlefield
      Martin O. Hofmann, *Lockheed Martin ATL*
      Amy McGovern, *University of Massachusetts*
      Kenneth R. Whitebread, *Lockheed Martin ATL*

Exh. p. 4

## PAPER SESSION 9: LEARNING AND ADAPTATION I

Tuesday, May 12

10:30 am - 12:30 pm

226  A Multiagent Perspective of Parallel and Distributed Machine Learning
Gerhard Weiß, *Technische Universität München*

231  Learning Situation-Dependent Costs: Improving Planning from Probabilistic Robot Execution
Karen Zita Haigh, *Carnegie Mellon University*
Manuela M. Veloso, *Carnegie Mellon University*

239  Online Learning about Other Agents in a Dynamic Multiagent System
Junling Hu, *University of Michigan*
Michael P. Wellman, *University of Michigan*

247  Learning What Is Relevant to the Effects of Actions for a Mobile Robot
Matthew D. Schmill, *University of Massachusetts*
Michael T. Rosenstein, *University of Massachusetts*
Paul R. Cohen, *University of Massachusetts*
Paul Utgoff, *University of Massachusetts*

## PAPER SESSION 10: LIFELIKE AGENTS

Tuesday, May 12

10:30 am - 12:30 pm

254  Behavioural Self-Organization in Lifelike Agents
Jiming Liu, *Hong Kong Baptist University*
Hong Qin, *Hong Kong Baptist University*

261  Integrating Reactive and Scripted Behaviors in a Life-Like Presentation Agent
Elisabeth André, *German Research Center for Artificial Intelligence (DFKI)*
Thomas Rist, *German Research Center for Artificial Intelligence (DFKI)*
Jochen Müller, *German Research Center for Artificial Intelligence (DFKI)*

269  BodyChat: Autonomous Communicative Behaviors in Avatars
Hannes Högni Vilhjálmsson, *MIT Media Laboratory*
Justine Cassell, *MIT Media Laboratory*

277  Actor-Based Computing: Vision Forestalled, Vision Fulfilled
Arthur Allen, *Charis Software Systems*

## PAPER SESSION 11: COMPUTATIONAL MARKET SYSTEMS

Tuesday, May 12

2:00 pm - 3:30 pm

285  A Market Architecture for Multi-Agent Contracting
John Collins, *University of Minnesota*
Ben Youngdahl, *University of Minnesota*
Scott Jamison, *University of Minnesota*
Bamshad Mobasher, *University of Minnesota*
Maria Gini, *University of Minnesota*

293  Competitive Scenarios for Heterogeneous Trading Agents
Juan A. Rodríguez-Aguilar, *IIIA, CSIC*
Francisco J. Martín, *IIIA, CSIC*
Pablo Noriega, *IIIA, CSIC*
Pere Garcia, *IIIA, CSIC*
Carles Sierra, *IIIA, CSIC*

301  The Michigan Internet AuctionBot: A Configurable Auction Server for Human and Software Agents
Peter R. Wurman, *University of Michigan*
Michael P. Wellman, *University of Michigan*
William E. Walsh, *University of Michigan*

## PAPER SESSION 12: AGENT CONTROL ARCHITECTURES I

Tuesday, May 12

2:00 pm - 3:30 pm

309  Increasing Agent Autonomy in Dynamic Environments
Subrata Das, *Charles River Analytics*
Alper Caglayan, *Charles River Analytics*
Paul Gonsalves, *Charles River Analytics*

317  Movement Control Methods for Complex, Dynamically Simulated Agents: Adonis Dances the Macarena
Maja J. Mataric, *University of Southern California*
Victor B. Zordan, *Georgia Institute of Technology*
Zachary Mason, *Brandeis University*

325  Integrating Active Perception with an Autonomous Robot Architecture
Glenn Wasson, *University of Virgina*
David Kortenkamp, *Metrica, Inc., TRACLabs*
Eric Huber, *Metrica, Inc., TRACLabs*

## VIDEO SESSION I
Tuesday, May 12                 2:00 pm - 3:30 pm

332 STEVE: A Pedagogical Agent for Virtual Reality
Jeff Rickel, *University of Southern California*
W. Lewis Johnson, *University of Southern California*

334 Virtual Petz: A Hybrid Approach to Creating Autonomous, Lifelike Dogz and Catz
Andrew Stern, *PF. Magic*
Adam Frank, *PF. Magic*
Ben Resner, *PF. Magic*

336 The Use of Space Discretization for Autonomous Virtual Humans
Srikanth Bandi, *Swiss Federal Institute of Technology*
Daniel Thalmann, *Swiss Federal Institute of Technology*

## PAPER SESSION 13: AGENTS FOR INFORMATION MANAGEMENT II
Tuesday, May 12                 4:00 pm - 5:00 pm

338 The ATL Postmaster: A System for Agent Collaboration and Information Dissemination
Jennifer Kay, *Lockheed Martin Advanced Technology Laboratories*
Julius Etzl, *Lockheed Martin Advanced Technology Laboratories*
Goutham Rao, *Lockheed Martin Advanced Technology Laboratories*
Jon Thies, *Lockheed Martin Advanced Technology Laboratories*

343 Understanding Jokes: A Neural Approach to Content-Based Information Retrieval
Stephane Zrehen, *USC Brain Project*
Michael A. Arbib, *USC Brain Project*

## VIDEO SESSION II
Tuesday, May 12                 4:00 pm - 5:00 pm

350 The RETSINA Multiagent System: Towards Integrating Planning, Execution and Information Gathering
Katia Sycara, *Carnegie Mellon University*
Anandeep S. Pannu, *Carnegie Mellon University*

352 Domain-Adaptive Information Systems (DAIS)
Kenneth R. Whitebread, *Lockheed Martin Advanced Technology Laboratories*
Harley J. Stein, *Lockheed Martin Advanced Technology Laboratories*

## PAPER SESSION 14: AGENT CONTROL ARCHITECTURES II
Wednesday, May 13                 10:30 am - 12:00 pm

354 Action Selection in an Autonomous Agent with a Hierarchical Distributed Reactive Planning Architecture
Vincent Decugis, *Groupe d'Etudes Sous-Marine de l'Atlantique*
Jacques Ferber, *Robotique et Microélectronique de Montpellier*

362 Issues in Temporal Reasoning for Autonomous Control Systems
Nicola Muscettola, *Recom Technologies, NASA Ames Research Center*
Paul Morris, *Caelum Research, NASA Ames Research Center*
Barney Pell, *Riacs, NASA Ames Research Center*
Ben Smith, *Jet Propulsion Laboratory, California Institute of Technology*

369 A Hybrid Procedural/Deductive Executive for Autonomous Spacecraft
Barney Pell, *Riacs, NASA Ames Research Center*
Edward B. Gamble, *Jet Propulsion Laboratory/California Institute of Technology*
Erann Gat, *Jet Propulsion Laboratory/California Institute of Technology*
Ron Keesing, *Caelum Research, NASA Ames Reseach Center*
James Kurien, *Caelum Research, NASA Ames Reseach Center*
William Millar, *Caelum Research, NASA Ames Reseach Center*
P. Pandurang Nayak, *Riacs, Nasa Ames Research Center*
Christian Plaunt, *Caelum Reseorch, NASA Ames Research Center*
Brian C. Williams, *NASA Ames Research Center*

## PAPER SESSION 15: ENGINEERING AGENT SYSTEMS II
Wednesday, May 13                 10:30 am - 12:00 pm

377 Personal Security Agent: KQML-Based PKI
Qi He, *Carnegie Mellon University*
Katia P. Sycara, *Carnegie Mellon University*
Timothy W. Finin, *University of Maryland Baltimore County*

385 Pitfalls of Agent-Oriented Development
Michael Wooldridge, *Queen Mary & Westfield College, University of London*
Nicholas R. Jennings, *Queen Mary & Westfield College, University of London*

392 Liability for Autonomous Agent Design
Carey Heckman, *Stanford Law School*
Jacob O. Wobbrock, *Stanford Symbolic Systems Program*

# PAPER SESSION 16: WWW AGENTS II

Wednesday, May 13                    10:30 am - 12:00 pm

400  A Web-based Information System that
     Reasons with Structured Collections of Text
     William W. Cohen, AT&T Labs-Research

408  WebACE: A Web Agent for Document
     Categorization and Exploration
     Eui-Hong (Sam) Han, University of Minnesota
     Daniel Boley, University of Minnesota
     Maria Gini, University of Minnesota
     Robert Gross, University of Minnesota
     Kyle Hastings, University of Minnesota
     George Karypis, University of Minnesota
     Vipin Kumar, University of Minnesota
     Bamshad Mobasher, University of Minnesota
     Jerome Moore, University of Minnesota

416  SHOPPER'S EYE: Using Location-based
     Filtering for a Shopping Agent in the
     Physical World
     Andrew E. Fano, Andersen Consulting

# PAPER SESSION 17: LEARNING AND
ADAPTATION II

Wednesday, May 13                    1:30 pm - 2:30 pm

422  A History-Based Approach for Adaptive
     Robot Behavior in Dynamic Environments
     François Michaud, Université de Sherbrooke
     Maja J. Mataric, University of Southern California

430  Effects of Misconception on Reciprocative
     Agents
     Sandip Sen, The University of Tulsa
     Anish Biswas, The University of Tulsa

# PAPER SESSION 18: APPLICATIONS

Wednesday, May 13                    1:30 pm - 2:30 pm

436  SANI: A Seamless and Non-Intrusive
     Framework and Agent for Creating
     Intelligent Interactive Homes
     Sandeep Chatterjee, Massachusetts Institute of
     Technology

441  Reactive Agents for Adaptive Image
     Analysis
     Jiming Liu, Hong Kong Baptist University

# POSTER SESSION

Wednesday, May 13                    1:30 pm - 3:00 pm

449  Artificial Autonomous Agents with
     Artificial Emotions
     Luís Miguel Botelho, ISCTE
     Helder Coelho, University of Lisbon

451  Mobility and Management Support for
     Mobile Agents
     Wen-Shyen E. Chen, National Chung-Hsing University
     S. T. Su, National Chung-Hsing University
     Yao-Nan Lien, National Chengchi University
     H. T. Shu, Institute for Information Industry
     Huiling Liu, Institute for Information Industry

453  Dynamic Software Agents for Business
     Intelligence Applications
     Qiming Chen, HP Laboratories
     Parvathi Chundi, HP Laboratories
     Umeshwar Dayal, HP Laboratories
     Meichun Hsu, HP Laboratories

455  RoboTA: An Agent Colony Architecture for
     Supporting Education
     Kenneth D. Forbus, Northwestern University
     Sven E. Kuehne, Northwestern University

457  A Formal Treatment of Distributed
     Matchmaking
     Somesh Jha, Carnegie Mellon University
     Prasad Chalasani, Carnegie Mellon University
     Onn Shehory, Carnegie Mellon University
     Katia Sycara, Carnegie Mellon University

459  A Synergy of Agent Components: Social
     Comparison for Failure Detection
     Gal A. Kaminka, USC/Information Sciences Institute
     Milind Tambe, USC/Information Sciences Institute

461  Subjective Avatars
     Michael Mateas, Carnegie Mellon University

463  Embodied Cultural Agents and Synthetic
     Sociology
     Simon Penny, Carnegie Mellon University

465  The Multi-Agent-Based Schedule Calculator
     (MASC) System
     Aruna Sankaranarayanan, Fidelity Investments
     Maja Mataric, University of Southern California

467  ULTIMA RATIO – Should Hamlet Kill
     Claudius?
     Michael Schroeder, University of Hannover
     Daniela A. Plewe, Franz-Künstler-Str
     Andreas Raab, University of Magdeburg

Exh. p. 7

469   Combining Mediation and Bidding Mechanisms for Agent-Based Manufacturing Scheduling
Weiming Shen, *The University of Calgary*
Douglas H. Norrie, *The University of Calgary*

471   Cognition and Affect: Architectures and Tools
Aaron Sloman, *University of Birmingham*
Brian Logan, *University of Birmingham*

473   An Open Architecture for Emotion and Behavior Control of Autonomous Agents
Juan D. Velásquez, *MIT Artificial Intelligence Laboratory*
Masahiro Fujita, *Sony Corporation*
Hiroaki Kitano, *Sony Computer Science Laboratory, Inc.*

475   The University of Michigan Digital Library Service Market Society
José M. Vidal, *University of Michigan*
Tracy Mullen, *University of Michigan*
Peter Weinstein, *University of Michigan*
Edmund H. Durfee, *University of Michigan*

477   Author Index

Exh. p. 8

# INTRODUCTION

Autonomous agents are computer systems that are capable of independent action in dynamic, unpredictable environments. Agents are also one of the most important and exciting areas of research and development in computer science today. Agents are currently being applied in domains as diverse as computer games and interactive cinema, information retrieval and filtering, user interface design, and industrial process control. The aim of the Agents '98 conference is to bring together researchers and developers from industry and academia in order to report on the latest scientific and technical advances, discuss and debate the major issues, and showcase the latest systems.

The First International Conference on Autonomous Agents (Agents '97) was held in Marina del Rey, California, in February 1997. It was attended by nearly 500 people, and received media coverage from such varied and widely-respected organizations as *Wired* magazine, the *New York Times*, and CNN. It was generally reckoned to have created something of a stir far beyond the audience that the organizers originally expected. All this made Agents '97 a hard act to follow — but we believe that we have succeeded in Agents '98.

It is only a year since the first Autonomous Agents conference, and yet in that time, agent technology has come a long way. At Agents '97, delegates were talking about the *possibility* of commercializing agent technology; of using agents in "real" systems. In just one year, we might have expected to see a few tentative efforts in this direction. But to our pleasure and surprise, we have seen agent technology adopted not just by a few research projects, but by nearly all major players in the commercial software marketplace. Agents are now an everyday component of software, with agent-enabled features rapidly becoming accepted as the norm, rather than as the exception.

Autonomous Agents '98 is a vivid illustration of the latest developments in agent technology. Like its predecessor, it is focused around three main strands:

- Software agents, which are situated in a software environment, and typically act as "expert assistants" to users carrying out some task.

- Robotic agents, which are physically embodied autonomous robots, sensing and acting in the everyday physical world.

- Synthetic agents, which inhabit shared virtual environments, often in the form of computer games, virtual theater, or interactive cinema.

Nearly 180 technical papers were submitted to the conference, and all were rigorously reviewed by the program committee. Of these submissions, only 57 were accepted as full technical papers. This high rejection rate is more a reflection of the care and thought that the program committee and area chairs put into the review and selection process than the standard of papers submitted. The overall outcome of the review process is a selection of papers, videos, and software and hardware demonstrations that showcase the very best of agent technology today.

We are confident that Agents '98 will confirm the Autonomous Agents series of conferences as a key forum for presenting work in the applications of agent technology.

## Acknowledgments

We would like to take this opportunity to thank everyone involved with the organisation of Agents '98. First, we would like to thank Tim Finin and the area chairs, for their hard work and first-rate scientific evaluation of papers and videos submitted. Dan Weld must be singled out for handling no less than 125 papers on software agents — somewhat more than anyone anticipated! Maja Mataric and Clark Elliott did excellent jobs of handling papers and videos in the robotics and synthetic agents/agents for entertainment areas. Keith Decker handled publicity for the conference, which involved (amongst other things) changes to the conference WWW site seemingly every hour. Milind Tambe handled the finances for the conference, and Maria Gini did a superb job of local organization. Mike Huhns handled the organization of workshops, an innovation of this year's conference, which added significantly to the richness of the conference program. Anand Rao was tutorial chair, and Henry Kautz and Robin Murphy handled the demonstration sessions, of software agents and robotic agents respectively. Afsanch Haddadi managed the poster sessions for the conference, and David Musliner the exhibits. Bamshad Mobasher handled registrations on behalf of the conference. The program committee did a typically thorough and conscientious job of reviewing a very large number of papers.

We would also like to thank the staff of AAAI, and in particular Carol Hamilton and Keri Vasser, for handling the submissions to the conference, putting together the proceedings so professionally, and generally giving excellent advice on organizational matters of all kinds. From ACM, we would like to extend our gratitude to Alisa Rivkin for her help with the proceedings. We would also like to thank ACM SIGART and ACM in general for their continued support, which has been of enormous benefit to us in so quickly establishing Autonomous Agents a major event in the conference calendar, and in addition our other sponsors, without whose support Agents '98 would have been significantly less interesting. The enthusiastic support of so many sponsors is a good indicator of how seriously the world is taking agent technology.

Finally, we would like to extend our thanks to Lewis Johnson for his sound and timely advice, and the Autonomous Agents steering committee for their helpful suggestions at many points throughout the long (and often exhausting) process of conference organization.

Katia P. Sycara (Carnegie Mellon University, USA) and

Michael Wooldridge (Queen Mary & Westfield College, UK)

March 1998

Exh. p. 9

# WebMate : A Personal Agent for Browsing and Searching*

Liren Chen and Katia Sycara

The Robotics Institute

Carnegie Mellon University

Pittsburgh, PA. 15213

lchen@cs.cmu.edu, katia@cs.cmu.edu

## Abstract

The World-Wide Web is developing very fast. Currently, finding useful information on the Web is a time consuming process. In this paper, we present WebMate, an agent that helps users to effectively browse and search the Web. WebMate extends the state of the art in Web-based information retrieval in many ways. First, it uses multiple TF-IDF vectors to keep track of user interests in different domains. These domains are automatically learned by WebMate. Second, WebMate uses the Trigger Pair Model to automatically extract keywords for refining document search. Third, during search, the user can provide multiple pages as similarity/relevance guidance for the search. The system extracts and combines relevant keywords from these relevant pages and uses them for keyword refinement. Using these techniques, WebMate provides effective browsing and searching help and also compiles and sends to users personal newspaper by automatically spiding news sources. We have experimentally evaluated the performance of the system.

Area: Software Agents

Keywords: Information Agents, Instructability, Knowledge acquisition and accumulation, long-term adaptation and learning, user modeling

## 1  Introduction

The Web is full of information and resources. People have at least three ways to find information they need: (1) by browsing (following hyper-links that seem of interest to them), (2) by sending a query to a search engine, such as Altavista, (3) by following existing categories in search engines, such as Yahoo or Lycos. The problem is that people have to spend a lot of time and effort to navigate but may not find interesting personalized information. However, it is difficult to find the wanted information because a user can't accurately express what he wants and search engines don't adapt their search strategies according to different users. Moreover, the problem is exacerbated because the information sources have high "noise", i.e. most of the pages are irrelevant to a particular user's interests. Intelligent software agents are being developed to deal with these issues.

Intelligent agents are programs that act on behalf of their human users to perform laborious information-gathering tasks [1] and they are one of the "hot" topics in Information Systems R&D at the moment. The last ten years have seen a marked interest in agent-oriented technology, spanning applications as diverse as information retrieval, user interface design and network management.

In this paper, we present WebMate, a personal software agent that accompanies a user when he browses and searches and provides intelligent help [1].

For clarity of presentation, the WebMate capabilities will be presented in roughly two categories: (1) learning user interests incrementally and with continuous update and automatically providing documents (e.g. a personalized newspaper) that match the user interests, and (2) helping the user refine search so as to increase retrieval of relevant documents. In section 2, we describe the architecture of the system. The WebMate acts as a proxy and monitors a user's actions. In section 3, we describe the user profile representation and learning algorithm [3, 4]. In addition, we provide experimental results of compiling a personal newspaper. In section 4, we discuss how to use the Trigger Pairs Model to extract relevant words to use as keyword refinements to improve search. We also present utilizing relevance feedback [8] during search to dynamically enhance the search for relevant documents. Finally, related work and our future work are described.

*This research has been supported in part by ARPA contract F33615-93-1-1330, and by ONR Grant N00014-96-1222.

Permission to make digital/hard copies of all or part of this material for personal or classroom use is granted without fee provided that the copies are not made or distributed for profit or commercial advantage, the copyright notice, the title of the publication and its date appear, and notice is given that copying is by permission of ACM, Inc. To copy otherwise, to republish, to post on servers or to redistribute to lists, requires prior specific permission and/or fee.
Autonomous Agents '98 Minneapolis MN USA
Copyright 1998 0-89791-983-1/98/ 5...$5.00

[1] The WebMate system has been operating on Web and has been downloaded by more than 600 users since it was published in the middle of September 1997 (15 days ago). Its DRL is http://www.cs.cmu.edu/~softagents/webmate.

Exh. p. 10

## 2  WebMate architecture

WebMate is composed of a stand-alone proxy that can monitor a user's actions to provide information for learning and search refinement, and an applet controller that interacts with a user (See Figure 1).

The stand-alone proxy is an HTTP proxy that sits between a user's web browser and the World-Wide Web. All HTTP transactions pass through WebMate which can monitor a user's browsing and searching activities and learn from them.

The applet controller is the interface between the user and the stand-alone proxy. Through it, the user can express his interests when he browses and provide relevance feedback when he searches. In addition, through the applet controller, the user receives intelligent help from WebMate.

## 3  Learning profile to compile personal newspaper

### 3.1  Profile Representation and Learning Algorithm

There are several machine learning approaches that can be used to learn a user profile, such as Bayesian classifier, Nearest Neighbor, PEBLS, Decision Trees, TF-IDF, Neural Nets [4, 5]. In order for a particular technique to be effective, it should match the characteristics of the task and the user.

The filtering task for our agent involves judging whether an article is relevant or irrelevant to the user based on the user profile, in an environment where the prior probability of encountering a relevant document is very low compared to the probability of encountering an irrelevant document. In such an environment, it would be very frustrating and time consuming for a user to interact with an agent that starts with no knowledge but must obtain a set of positive and negative examples from user feedback. When a user browses, he does not want to evaluate all web pages that might contain potentially interesting information. To reduce user evaluation burden, WebMate collects only examples that are interesting to the user (only positive training examples). This kind of interaction presents potential problems since the documents that a user might label as "I like It" might fall into many distinct domains (e.g fishing, computer science, soccer). Those subclasses correspond to the different interests a user has. There have been two methods to address the problem of multiple user interests. The first is to keep a single user profile where the keywords might come from different domains but are "averaged". This method has the disadvantage that averaging the vectors from the different documents might decrease too much the weights of words that are important for only a few of the interest categories. The second method is to ask the user to explicitly provide labels for the sub-categories of interest. WebMate does not ask the user to label the category that the interesting document is in, but learns the categories automatically.

In contrast to other systems that learn a user profile and use it statically to determine relevant documents, WebMate learns the user profile incrementally and continuously. When a new positive example is known, the system updates the profile. In order to save on storage space, the system doesn't keep any of the previous positive example documents. It only keeps the profile learned from those positive examples. In this way, the system will adapt to the user's evolving and recent interests.

WebMate utilizes TF-IDF method [7] with multiple vectors representation. The basic idea of the algorithm is to represent each document as a vector in a vector space so that documents with similar content have similar vectors. Each dimension of the vector space represents a word and its weight. The values of the vector elements for a document are calculated as a combination of the statistics term frequency $TF(w, d)$ (the number of times word $w$ occurs in document $d$) and document frequency $DF(w)$ (the number of documents the word $w$ occurs in at least once). From the document frequency the inverse document frequency $IDF(w)$ can be calculated.

$$IDF(w) = \log \frac{|D|}{DF(w)}$$

$|D|$ is the total number of documents. The value $d^{(i)}$ of an element in the vector is then calculated as the product

$$d^{(i)} = TF(w_i, d) \times IDF(w_i)$$

We have developed an algorithm for *multi TF-IDF* vector learning. The algorithm follows.

We assume that a user has at most $N$ domains of interest. [2] Assume the initial profile set is $V$, $|V| = 0$; the predefined number of TF-IDF vectors in the profile set is $N$, the preset number of elements of a vector is $M$. For each positive example (i.e. an HTML documents that the user has marked "I like It"), do:

1. Preprocess: parse HTML page, deleting the *stop* words (or non-informative words) such as "a", "the", "is", "in", etc, stemming the plural noun to its single form and inflexed verb to its original form, extracting the words in *title*(<TITLE>), *head1*(<H1>), *head2*(<H2>), *head3*(<H3>) because they will be given more weights;

2. Extract the TF-IDF vector for this document, let it be $V_i$;

3. If $|V| < N$ ($|V|$ is the number of vectors in the profile set $V$), then $V \Leftarrow V \cup V_i$;

4. Otherwise, calculate the cosine similarity between every two TF-IDF vectors including the vectors in the

---

[2] In the current implementation, N is heuristically set to 10



Figure 1: System Architecture

profile set $V$ and the new document vector $V_i$. Assume the profile set $V$ is $\{V_1, V_2, \ldots, V_n\}(n = N)$.

$$Sim(V_j, V_k) = \frac{V_j \bullet V_k}{|V_j| \times |V_k|} \quad j, k \in \{1, 2, \ldots, n, i\}$$

5. Combine the two vectors $V_l$ and $V_m$ with the greatest similarity.

$$V_l = V_l + V_m \quad (l, m) = \arg\max_{(x,y)}(Sim(V_x, V_y))$$

6. Sort the weights in the new vector $V_k$ in decreasing order and keep the highest M elements.

This algorithm is run whenever a user marks a document as "I like it". Thus, the user profile is incrementally, unobtrusively and continuously updated.

## 3.2  Compiling personal newspaper

We utilize the approach of learning user profile to compile a personal newspaper [9, 10, 11]. We do this in two ways.

One way is to automatically spide a list of URLs that the user wants monitored. An example of such a URL is one that consists of many news headlines like the home page of the NewsLinx Company[3]. WebMate (1) parses the html page , (2) extracts the links of each headline, (3) fetches those pages, (4) constructs the TF-IDF vector for each of those pages (using as additional heuristics that words in title, and headings are given additional weights), and (5) calculates the similarity with the current profile. If the similarity is greater than some threshold, it recommends the page to the user, and sorts all the recommended pages in decreasing order of similarity to form the personal newspaper. All operations are

[3]http://www.newslinx.com/

often performed in the middle of the night when the network traffic is low. In the morning, the user can read the recommended personal newspaper.

If the user does not provide any URLs that he would like to be the information sources, WebMate constructs a query[4] using the top several words in the current profile and sends it to popular search engines (e.g. Altavista, Yahoo). If the result is needed immediately, the results returned by the search engines are directly used as the recommended web pages. Otherwise, the system fetches the pages corresponding to each and every URL in the results. It then calculates the similarity of the profile and these web pages and recommends the pages whose similarity is greater than some threshold presenting the results in descending order of relevance.

## 3.3  Experiments

In our experiments, the system monitors about 14 news sites that contain articles about high technology including LAN time news[4], Media Central [5], PC magazine online [6], etc. We recorded the personal newspaper and evaluated whether a piece of news is interesting to us (Table 1). The first column is the date of the personal news, the second column is the percentage accuracy of how many pieces of news are interesting in the top 10 returned by WebMate, the third column is the percentage accuracy in the top 20. In order to evaluate the learning approach, the percentage accuracy in the whole recommended news (the number of interesting news articles divided by the total number of news articles in the newspaper) is given in the fourth column.

From Table 1, we see that the average accuracy (relevance rate) that the recommended news is relevant to our

[4]http://www.lantimes.com/
[5]http://www.mediacentral.com/Magazines/MediaDaily/Archive
[6]http://www8.zdnet.com/pcmag/

134

| Date | Accuracy in top 10 | Accuracy in top 20 | Accuracy in whole |
|------|-------------------|-------------------|-------------------|
| Sep.16 | 70% | 60% | 17/55=31% |
| Sep.17 | 40% | 35% | 11/42=26% |
| Sep.18 | 50% | 35% | 9/33=27% |
| Sep.19 | 60% | 65% | 18/76=24% |
| Sep.20 | 50% | 40% | 9/29=31% |
| Sep.22 | 40% | 40% | 12/49=25% |
| Sep.23 | 50% | 50% | 18/78=23% |
| Sep.24 | 60% | 56% | 10/18=56% |
| Average | 52% | 49% | 30.4% |

Table 1: Experiment Results

interests is between 50% and 60% in the top 10 news articles . Generally the system will spide more than 500 pieces of news for a day. In the whole recommended news, the average accuracy is about 30%. But if the news are randomly chosen from 500 pieces of news in which we assume there are 100 interesting news to us (this is based on our observation that for a typical news site such as LinkExchange, there are about 10 out of 50 pieces of news that are interesting to us in any given day), the default accuracy in the whole news is about 20%. So a 50% to 60% accuracy, achieved by WebMate, represents a two to three-fold accuracy increase.

There are several factors that lower the accuracy of the system. First, it is difficult to determine which links are the headlines of the news and which links are irrelevant stuff such as advertisements. We are currently working on heuristics to filter out advertisements. So, currently, all the links in the page are used to calculate the similarity, not just the links of the news headlines. Second, while calculating the TF-IDF vectors, the irrelevant stuff around the news affects the accuracy of the TF-IDF.

## 4   Search refinement by keywords expansion and relevance feedback

### 4.1   Trigger Pairs Model to extract relevant words

Single keywords are usually ambiguous, or too general. Moreover, they can occur in vast quantities of documents, thus making the search return hundreds of hits, most of which are irrelevant to the intended user query. Giving additional keywords can refine search providing considerable improvement in the retrieval results. Good refinement words must have meanings that help disambiguate or make more specific the original search word. For example, the word "stock" has more than 10 definition in the WordNet[7] including "the capital raised by a corporation through the issue of shares entitling holders to partial ownership", "gun-stock", "inventory", "stock certificate", etc. Providing the refinement words

that correspond to each one of those meanings, would help a search engine, for example, to prune out documents where the word is used with any of its other meanings. There are three ways to expand the query: manual query expansion, semi-manual query expansion, and automatic query expansion [12]. No matter which method is used, the key point is to get the best refinement words. In manual query expansion, although the user knows the intended meaning of the keyword she is using, she may not be able to provide the best refinement words. "Best" here means refinement words that most frequently co-occur with the word in its intended meaning in large number of documents. In other words, one of the characteristics of good refinement words is that they be domain specific. In this section we present the method for automatically finding appropriate keywords to constrain and refine search for relevant documents.

We use the Trigger Pairs Model [13, 14]. If a word S is significantly correlated with another word T, then (S, T) is considered a "trigger pair", with S being the trigger and T the triggered word. When S occurs in the document, it triggers T, causing its probability estimate to change. That is, when we see the word S appearing at some point in a text, we expect the word T to appear somewhere after S with some confidence[8]. The mutual information ($MI$) that considers the words order is a measure of the correlation and used to extract trigger pairs from large corpus. The mutual information is given by the following formula:

$$\mathcal{MI}(s,t) = \mathcal{P}(s,t) \log \frac{\mathcal{P}(s,t)}{\mathcal{P}(s)\mathcal{P}(t)}$$

To evaluate the method, we used the Broadcast News Corpus of $140M$ words and set the maximum distance between S and T to 500. Some randomly selected trigger pairs which are sorted in decreasing order of the mutual information are shown.

product ← {maker, company, corporation, industry, incorporate, sale, computer, market, business, sell, machine, consumer, share, software, manufacture, electronic, base, million, manufacturer}

car ← {motor, auto, model, maker, vehicle, ford, buick, honda, inventory, assembly, chevrolet, sale, nissan, incentif, pontiac, plant, toyota, dealer, chrysler}

interest ← {rate, bank, loan, point, dollar, credit, bond, percent, investment, market, reserve, term, debt, investor, billion, exchange, higher, treasury, lower}

fare ← {airline, maxsaver, carrier, discount, air, coach, flight, traveler, travel, continental, unrestrict, ticket, texas, northwest, pettee, match}

music ← {musical, symphony, orchestra, composer, song, concert, tune, concerto, sound, musician, classical, album, violin, violinist, jazz, audience, conductor, play, audio, rock, cello, perform, dance}

---

[7] http://www.cogsci.princeton.edu/~wn/

[8] In the Trigger Pairs Model, (S, T) is different from (T, S), so the Trigger Pairs Model is different from the method of using co-occurrence of two words that is generally used in other keywords expansion experiments[12]

pork ← {meat, hog, slaughter, livestock, mercantile, cattle}

plead ← {guilty, sentence, insider, indictment, indict, ivan, charge, attorney, fraud, boesky, lasker, criminal, pleas, investigation, plea, court, prosecutor, prison, felony, defendant, cooperate, palmieri}

We also extracted trigger pairs from the Wall Street Journal Corpus of 1M words. We found that the trigger pairs are domain specific. For example, the triggers to "Stock" in news and media domain (Broadcast News Corpus, 140M tokens) are {company, bond, buy, business, bank, dow, earning, composite, cent, analyst, big, chrysler, investor, cash, average, economy, close, capital, chip, ...}. However, in business and Economic (Wall Street Journal Corpus, 1M tokens) the triggers are {share, investor, index, exchange, price, dow, market, buy, point, jone, trade, trader, average, cent, industrial, gain, shareholder, company, board, ...}

## 4.2  Keywords Expansion Algorithm

The trigger pair method can provide several candidate refinement keywords. An additional question is, how many and which ones to use under any given circumstances. extract relevant words from large corpus. For a search with only one keyword, the top several triggers to the keyword are used to expand the search. But for a search with more than 2 keywords, the choice becomes more complicated. We use the following algorithm for keywords expansion based on the trigger pairs:

Let us assume that the keywords are $K_1, K_2, \ldots, K_m$, and the the expected number of refinement words is N. Initialize $n = m$, $S$ is the empty set.

1. $S_1 = \{s_{11}, s_{12}, \ldots, s_{1i}\} \rightarrow K_1$, $S_1$ is the triggers set to $K_1$. $s_{11}, s_{12}, \ldots, s_{1i}$ are sorted in decreasing order of the mutual information.

   $S_2 = \{s_{21}s_{22}, \ldots, s_{2j}\} \rightarrow K_2$, $S_2$ is the triggers set to $K_2$

   ...

   $S_m = \{s_{m1}, s_{m2}, \ldots, s_{mk}\} \rightarrow K_m$, $S_m$ is the triggers set to $K_m$

2. $S = S \cup (\forall (S_p, S_q, \ldots, S_r)(S_p \cap S_q \cap \ldots \cap S_r))$, and $(S_p, S_q, \ldots, S_r)$ is one of the combinations of n sets out of m. The words in the $S$ are sorted in decreasing order of mutual information.

3. If $|S| \geq N$, let the top N words in the $S$ be the refinement words and stop.

4. otherwise, let $n \Leftarrow n - 1$, goto 2.

This method can improve the recall rate of the search. For example, if a system uses TF-IDF to extract informative words to index documents, some $K_i$ itself might be ignored because of its low weight. However, some words in $S_i$ could

be selected thus helping to recall documents where the ignored $K(i)$ appears thus improving recall rate.

This method also provides disambiguation information for ambiguous query words. For example, $K_1 = charge$ and $S_1 = \{federal, investigation, attorney, plead, indict, allege, fraud, guilty, indictment, jury, prosecutor, court, case, criminal, law, grand, commission, insider, conspiracy, \ldots\}$, $K_2 = \{pay, dollar, million, bank, service, tax, raise, federal, bill, require, percent, charge, paid, law, client, loan, money, legal, payment, \ldots\}$, then $\mathcal{K} = \{K_1, K_2\} = \{Charge, Fee\}$ and $S = S_1 \cup S_2 = \{million, pay, dollar, tax, service, federal, client, law, loan, legal, payment, court, suit, file, cost, case, company, firm, \ldots\}$. So triggers, such as million, pay, dollar, tax and service, help confine and disambiguate the meaning of the word "charge".

## 4.3  Examples on keywords expansion

In this section, we present a typical example of how our refinement method indeed helps improve search results. Suppose the user is interested in documents where the word "stock" appears in its financial meaning. Inputting simply the keyword "stock" to Lycos and Altavista returns the following results.

From Lycos:

1) YOSEMITE STOCK PHOTOS, ROCK CLIMBING, Daniela Masetti PHOTOS

2) YOSEMITE STOCK PHOTOS, ROCK CLIMBING PHOTOS

3) YOSEMITE STOCK PHOTOS, FISHING PHOTO

*4) Stock information Java Applet

5) STOCK GRAPHICS & PHOTOS

*6) American Stock Transfer & Trust Home Page

*7) STOCK CHARTS

*8) GROWTH STOCK ADVISOR FULL DISCLAIMER

*9) Stock information Java Applet

10) Ocean Stock

Only 5 hits are relevant to the financial meaning of "stock" in the top 10.

From Altavista:

1. E. coli Genetic Stock Center

2. Michael Paras Photography: Photographs, Photography, stock photos, stock photo

*3. iGOLF Features - Stocks & Industry - Stock Report: Tuesday, September 5, 1995

4. Cedar Stock Resort Trinity Center Marina

*5. Stock 4 Art: HOME PAGE!

6. NET INFO - Luc Sala - Myster - stock footage

*7. The Official Vancouver Stock Exchange

*8. Stock Club

*9. NIAGARA MOHAWK DECLARES PREFERRED STOCK DIVIDEND

*10. The Italian Stock Exchange

136

There are 6 hits that are relevant to the financial meaning of the "stock" in the top 10.

At this time, it is difficult for a user to figure out what words should be used to expand or refine the current search. So the trigger pairs can be used to expand the current search. The triggers to "stock" are {share, investor, index, exchange, price, dow, market, buy, point, jone, trade, trader, average, cent, industrial, gain, shareholder, company, board, ... }. If we use the first word "share" in the ranked triggers list to expand the keyword "stock" and send {stock share} to the above two search engines, the following results get returned.

From Lycos:

* 1) Share, Stock or CD Secured Loans
* 2) Share / Stock Option Scheme Administration
* 3) Allfinanz: Stock, Share Dealers
* 4) One Share of Stock, Inc. - Ordering Info
* 5) One Share of Stock - Product Line
* 6) Akiko New Zealand: Stock And Share Market Links (12-Sep-1995)
* 7) Akiko New Zealand: Stock And Share Market Links (12-Sep-1995)
* 8) Money: $50 can buy share of stock in a company
* 9) ONE SHARE OF STOCK - Order Form
* 10) One Share of Stock, Inc. - Company Info

Those results are all relevent to the financial meaning of the word "stock".

From Altavista:

* 1. South Africa: Stock market: Share price index (dissemination formats)
* 2. Denmark: Stock market: Share price index (base page)
* 3. ONE SHARE OF STOCK, INC.
* 4. Chile: Stock market: Share price index (base page)
* 5. Accounting financial software share stock stock market money portfolio bank mutual f
* 6. Singapore: Stock market: Share price index (dissemination formats)
* 7. Mexico: Stock market: Share price index (base page)
* 8. Netherlands: Stock market: Share price index (base page)
* 9. Ireland: Stock market: Share price index (dissemination formats)
* 10. Japan: Stock market: Share price index (base page)

Those results are all relevent to the financial meaning of the word "stock".

We can see the results are better than before. We can also refine the search "stock share" if the results are not satisfactory. The intersection of the triggers sets of "stock" and "share" is {stake, outstanding, company, common, quarter, convertible, shareholder, cent, takeover, earning, exchange, incorporate, acquire, million, composite, dividend, percent, point}. Again we can use the words in this set to continue to expand the keywords "stock" and "share" by choosing one or more of them.

## 4.4  Relevance feedback

One of the most important ways in which current information retrieval technology supports refining searches is relevance feedback. Relevance feedback is a process where users identify relevant documents in an initial list of retrieved documents, and the system then creates a new query based on those sample relevant documents [14]. The idea is that since the newly formed query is based on documents that are similar to the desired relevant documents, the returned documents will indeed be similar. The central problems in relevance feedback are selecting "features" (words, phrases) from relevant documents and calculating weights for these features in the context of a new query [8].

In WebMate agent, the *context* of the search keywords in the "relevant" web pages is used to refine the search because we think that if a user tells the system some page is relevant to his searh, the context of the search keywords is more informative than the content of the page.

Given a relevant page, the system first looks for the keywords (assume $K_i$ is one of the keywords) and context of the keywords (assume the context of the keyword $K_i$ is $\ldots W_{-5}W_{-4}W_{-3}W_{-2}W_{-1}K_iW_1W_2W_3W_4W_5 \ldots$). For each keyword $K_i(i)$, the system then extracts the chunks of 5 words $W_{-5}W_{-4}W_{-3}W_{-2}W_{-1}$ before $K_i$ and the chunks of 5 words $W_1W_2W_3W_4W_5$ after $K_i$ until all the keywords in the query are processed.

Then, a bag of chunks are collected and passed to the processes of deleting the stop words and calculating the frequency. After that, the top several frequent words are used to expand the current search keywords.

For example, the following text is part of the overview of our Intelligent Agents project at CMU[9]. Suppose a user gives this text as a relevance feedback to the search keywords "intelligent agent".

Intelligent Software Agents

The voluminous and readily available information on the Internet has given rise to exploration of Intelligent Agent technology for accessing, filtering, evaluating and integrating information.

In contrast to most current research that has investigated single-agent approaches, we are developing a collection of multiple agents that team up on demand—depending on the user, task, and situation—to access, filter and integrate information in support of user tasks. We are investigating techniques for developing distributed adaptive collections of information agents that coordinate to retrieve, filter and fuse information relevant to the user, task and situation, as well as anticipate user's information needs.

Approach is based on:

adaptable user and task models

flexible organizational structuring

a reusable agent architecture

---

[9]The URL of our project is: http://www.cs.cmu.edu/~softagents.

Underlying Technology

Our intra-agent architecture and inter-agent organization is based on the RETSINA multiagent reusable infrastructure that we are developing.

Using our method, the refinement words extracted from the text are {software, structure, reusable, architecture, technology, organizational, network, schedule, research, rise}. Most of the refinement words reflect well the characteristic of the project. But, if instead of using the context method, we considered the whole content of the page when calculating the frequency, then the expanding words would be {software, information, task, area, application, technology, user, current, develop, underlying}. Obviously, the context of the search keywords can reflect the relevance better than the whole content of the web page.

Subsequently, we used the top 5 words {software structure reusable architecture technology} to expand the search "intelligent agent". These are the results returned by Lycos. The content of links marked with "*" are similar to the content of the page given as the "relevant" feedback.

*1) The Agent Building Shell: Programming Co-operative Enterprise Agents

(http://www.ie.utoronto.ca/EIL/ABS-page/ABS-overvie)

*2) The Agent Building Shell: Programming Co-operative Enterprise Agents

(http://www.ie.utoronto.ca/EIL/ABS-page/ABS-overvie)

*3) An Architecture for Supporting Quasi-agent Entities in the WWW

(http://www.cs.umbc.edu/~cikm/iia/submitted/viewing)

4) Knowledge Sharing Papers

(http://hpp.stanford.edu/knowledge-sharing/papers/R)

5) Knowledge Sharing Papers

(http://hpp.stanford.edu/knowledge-sharing/papers/i)

6) Knowledge Sharing Papers

(http://ksl.stanford.edu/knowledge-sharing/papers/i)

*7) The Agent Building Shell: Programming Co-operative

(http://www.ie.utoronto.ca/EIL/ABS-page/ABS-intro.h)

*8) Special Issue AI in Medicine Editorial Special Issue Artificial Intelligence in Medicine "Architectures for Intelligent Systems Based on Reusable Components"

(http://www.swi.psy.uva.nl/usr/Schreiber/papers/Mu)

*9) CS 791A -- Agent Architectures for Information Gathering

(http://centaurus.cs.umass.edu/ig-seminar.html)

*10) Interaction Protocols for Software Agents on the World Wide Web

(http://rbse.jsc.nasa.gov/eichmann/www-s96/interact)

## 5  Related work

WebWatcher [10][16] is a tour guide for the web. It learns from experiences of *multiple users* to improve its advice-giving skills. Letizia [17] can recommend nearby pages by doing lookahead search. Syskill & Webert [4] is a software agent that learns to rate pages on the Web, deciding which pages might interest a user. Lira [3] works offline and returns a set of pages that match the user's interest. Daily Briefing [11] allows you to use Autonomy Intelligent Agents as Newshounds to sniff out stories and compile a personal daily newspaper with stories, features and articles selected from the Internet to match your requirements. WBI [12] is a personal web agent designed to personalize your web browsing. Metabot [13] is a Java-based, client-server application for searching the web by performing a simultaneous query on multiple web search services. CoolURL [14] is an exploratory technology that enables users to use agent technology to recommend cool URLs to a community of users. Beehive [18] is a distributed system for social sharing and filtering of information. Firefly [15] uses software agents that automate the process of retrieving data from the Web based on what they know about their owner's tastes and interests. Their core technology is the social filtering (or collaborative filtering). WiseWire [16] uses advanced neural net technology and adaptive collaborative filtering to filter all types of digital content that is personally relevant to you.

## 6  Summary and Future Research

WebMate is a personal agent running on the end user machine. It accompanies users from page to page to provide assistance. It can learn the user profile and compile personal newspaper, help the user improve the search by keyword expansion and relevance feedback, and aid the user in other ways such as alias, reference, prefetch, and monitor bookmarks or web pages for changes.

Currently in WebMate, only words are used to represent a user's profile. We feel that new machine learning algothrims for classifying the new web pages are necessary to improve the accuracy of the recommendation. We are currently implementing phrases, bigram [13] of words and plan to explore the trigger pairs or relevant words to improve the learning. In addition, we are implementing heuristics to filter out advertisements and irrelevant content around web pages comtaining news.

[10] http://www.cs.cmu.edu/Groups/webwatcher/
[11] http://www.agentware.com/main/dailyme.html
[12] http://www.networking.ibm.com/iag/iaghome.html
[13] http://metabot.kinetoscope.com/docs/docs.html
[14] http://support.intel.com/oem-developer/internet/coolurl/COOL_FAQ.HTM
[15] http://www.firefly.com/
[16] http://www.wisewire.com/

Exh. p. 16

# References

[1] Katia Sycara, Anandeep Pannu, Mike Williamson, Dajun Zeng, Keih Decker. *1996, Distributed Intelligent Agents*. Published in IEEE Expert, Intelligent Systems & their applications, Dec, 1996

[2] Shaw       Green,              Leon Hurst, Brenda Nangle, Padraig Cunninggham, Fergal Somers, Richard Evans. *1997, Software Agents: A review*. http://www.cs.tcd.id/Brenda.Nangle/iag.html

[3] Marko Balabanovic, Yoav Shaham. *1995, Learning Information Retrieval Agents: Experiments with Automated Web Browsing*. Proceedings of the AAAI Spring Symposium Series on Information Gathering from Heterogeneous, Distributed Environments: 13-18.

[4] M. Pazzani, J. Muramatsu, D. Billsus. *1996, Syskill & webert: Identifying interesting web sites*. In AAAI conference, Portland, 1996

[5] Pannu, A. and Sycara, K. *1996, A Personal Text Filtering Agent*. Proceedings of the AAAI Stanford Spring Symposium on Machine Learning and Information Access, Stanford, CA, March 25-27, 1996.

[6] K.Lang. *1995, NewsWeeder: Learning to filter Netnews*. Proceedings of Machine Learning, Morgan Kaufman, San Francisco, 1995

[7] G.Salton and M.J.McGill. *1983, Introduction to Modern Information Retrieval*. McGraw-Hill, New York, 1983

[8] Gerard Salton, Chris Buckley. *1988, Improving Retrieval Performance by Relevance Feedback*. Cornell University, 88-898

[9] Marbo Balabonovic, Yoav Shoham. *1997, Combining Content-Based and Collaborative Recommendation*. Communications of the ACM, March, 1997

[10] Peter W. Foltz, Susan T. Dumais. *1992, Personalized Information Delivery: An Analysis of Information Filtering Methods*. Published in Comminucations of the ACM, 35(12), 51-60, 1992

[11] Paul       Resnick. *1997, Filtering Information on the Internet*. http://www.sciam.com/0397issue/0397resnick.html

[12] Chengfeng Han, Hideo Fujii, W. Bruce Croft. *1994 Automatic Query Expansion for Japanese Text Retrieval*. UMass Technical Report

[13] Ronald Rosenfeld. *1994, Adaptive Statistical Language Modeling: A Maximum Entropy Approach*. Camegie Mellon University, Ph.D. Thesis

[14] Susan Gauch, Robert P. Futrelle. *Experiments in Automatic Word Class and Word Sense Identification for Information Retrieval*. Proceedings of the Third Annual Symposium on Document Analysis and Information Retrieval

[15] Kathleen Webster, Kathryn Paul. *1996, Beyond Surfing: Tools and Techniques for Searching the Web*. Jan. 1996, Information Technology

[16] Thorsten Joachims, Dayne Freitag, Tom Mitchell. *1997, WebWatcher: A Tour Guide for the World Wide Web*. Proceedings of IJCAI97, August 1997.

[17] H.Lieberman. *1995, Letizia: An agent that assists web browsing*. In International Joint Conference of Artificial Intelligence, Montreal, Aug. 1995

[18] Bernardo A. Huberman, Michael Kaminsky. *1996, Beehive: A System for Cooperative Filtering and Sharing of Information*

[19] URL:     Collection     of     Bots     in     the     Web, http://www.botspot.com/

# Exh. 1003

# IJCAI-95

## Proceedings of the Fourteenth International Joint Conference on Artificial Intelligence

### Volume I

### Montréal, Québec, Canada

### August 20–25, 1995

Sponsored by the

International Joint Conferences on Artificial Intelligence, Inc. (IJCAII)
American Association for Artificial Intelligence
Canadian Society for Computational Studies of Intelligence
Société Canadienne pour l'étude de l'intelligence par ordinateur

Iron Dome, Exh. 1003

Copyright © 1995 International Joint Conferences on Artificial Intelligence, Inc.
All rights reserved.

Edited by Chris S. Mellish

Distributed by
Morgan Kaufmann Publishers, Inc.
2929 Campus Drive, Suite 260
San Mateo, California 94403

Printed in the United States of America.

Production management, design, and composition by
Professional Book Center, Denver, Colorado.

GEORGETOWN UNIVERSITY
LIBRARIES

MAR 25 1996

Susann LuperFoy
1320 Schuman Court
Vienna, Virginia  22182

# Brief Contents

## Volume 1

| | |
|---|---|
| | iv |
| Ordering Information | v |
| Foreword | vii |
| IJCAI-95 Conference Organization | viii |
| Program Committee | viii |
| National Committee | ix |
| IJCAII Organization | x |
| AAAI Organization | xi |
| CSCSI/SCEIO Organization | xi |
| Corporate Sponsorship | xii |
| IJCAI-95 Awards | xiii |
| Invited Speakers | xiv |
| Panels | xv |
| IJCAI-95 Reviewers | xix |
| IJCAI-95 Program Schedule | xx |
| Contents | 1 |
| Action and Perception | 173 |
| Automated Reasoning | 369 |
| Case Based Reasoning | 415 |
| Cognitive Modelling | 471 |
| Connectionist Models | 539 |
| Constraint Satisfaction | 653 |
| Distributed AI | 717 |
| Genetic Algorithms | 749 |
| Knowledge Base Technology | 799 |
| Knowledge Representation | 937 |
| Awards | 959 |
| Invited Speakers | 1015 |
| Author Index | |

## Volume 2

| | |
|---|---|
| | iv |
| Ordering Information | v |
| IJCAI-95 Conference Organization | vi |
| Program Committee | vi |
| National Committee | vii |
| IJCAII Organization | viii |
| IJCAI-95 Program Schedule | ix |
| Contents | 1017 |
| Learning | 1241 |
| Natural Language | 1441 |
| Non-monotonic Reasoning | 1565 |
| Planning | 1719 |
| Qualitative Reasoning and Diagnosis | 1845 |
| Reasoning Under Uncertainty | 1931 |
| Temporal Reasoning | 2025 |
| Panels | 2043 |
| Videos | 2075 |
| Author Index | |

# Contents

## VOLUME 1

## ACTION AND PERCEPTION

### VISION: EARLY VISION

Fitting Models to Distributed Representations of Vision
*Sourabh A. Niyogi* . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Natural Basis Functions and Topographic Memory for
Face Recognition
*Rajesh P. N. Rao and Dana H. Ballard* . . . . . . . . . . . 10

### VISION: ACTIVE VISION

Representations for Active Vision
*Cornelia Fermüller and Yiannis Aloimonos* . . . . . . . . 20

Animate Vision in a Rich Environment
*Tomas Uhlin and Jan-Olof Eklundh* . . . . . . . . . . . . . 27

### VISION: QUALITATIVE METHODS

A Qualitative Approach to Sensor Data Fusion for
Mobile Robot Navigation
*Steven Reece and Hugh Durrant-Whyte* . . . . . . . . . . . 36

Qualitative Interpretation of Spectral Images:
Reasoning with Uncertain Evidence
*Qi Zhao and Toyoaki Nishida* . . . . . . . . . . . . . . . . . . . 42

### VISION: SYSTEMS AND ARCHITECTURES 1

Control Structures for Incorporating Picture-Specific
Context in Image Interpretation
*Rajiv Chopra and Rohini K. Srihari* . . . . . . . . . . . . . 50

Visual routines and visual search: a real-time
implementation and an automata-theoretic analysis
*Ian Horswill* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

### VISION: SYSTEMS AND ARCHITECTURES 2

Adaptable Planner Primitives for Real-World Robotic
Applications
*Robert W. Wisniewski and Christopher M. Brown* . . . . 64

An Architecture for Vision and Action
*R. James Firby, Roger E. Kahn, Peter N. Prokopowicz,
and Michael J. Swain* . . . . . . . . . . . . . . . . . . . . . . . . 72

### VISION: VISION AND OTHER PERCEPTION

Active Agent Oriented Multimodal Interface System
*Osamu Hasegawa, Katsunobu Itou, Takio Kurita, Satoru
Hayamizu, Kazuyo Tanaka, Kazuhiko Yamamoto, and
Nobuyuki Otsu* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Robotic Perception of Material
*Eric Krotkov* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

### ROBOTICS: MULTI-AGENT SYSTEMS

Knowledge Considerations in Robotics and
Distribution of Robotic Tasks
*Ronen I. Brafman and Yoav Shoham* . . . . . . . . . . . . . 96

RESC: An Approach for Real-time, Dynamic
Agent Tracking
*Milind Tambe and Paul S. Rosenbloom* . . . . . . . . . . 103

### ROBOTICS: NAVIGATION

Self-Organization of Symbolic Processes through
Interaction with the Physical World
*Jun Tani* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

Using Knowledge to Isolate Search in Route Finding
*Bing Liu* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

### ROBOTICS: LEARNING

Motion Sketch: Acquisition of Visual Motion
Guided Behaviors
*Takayuki Nakamura and Minoru Asada* . . . . . . . . . . 126

Using the Representation in a Neural Network's Hidden
Layer for Task-Specific Focus of Attention
*Shumeet Baluja and Dean A. Pomerleau* . . . . . . . . . 133

### ROBOTICS: FORMAL METHODS

Formalizing Behavior-based Planning for
Nonholonomic Robots
*Vikram Manikonda, James Hendler, and
P. S. Krishnaprasad* . . . . . . . . . . . . . . . . . . . . . . . . . 142

Logic Programming for Robot Control
*David Poole* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

### AUDITORY SCENE ANALYSIS

Organization of Hierarchical Perceptual Sounds: Music
Scene Analysis with Autonomous Processing Modules
and a Quantitative Information Integration Mechanism
*Kunio Kashino, Kazuhiro Nakadai,
Tomoyoshi Kinoshita, and Hidehiko Tanaka* . . . . . . . 158

Residue-Driven Architecture for Computational
Auditory Scene Analysis
*Tomohiro Nakatani, Hiroshi G. Okuno, and
Takeshi Kawabata* . . . . . . . . . . . . . . . . . . . . . . . . . . 165

## AUTOMATED REASONING

### PROOF PLANNING

Relational Rippling: A General Approach
*Alan Bundy and Vincent Lombart* . . . . . . . . . . . . . . 175

A Model of Analogy-Driven Proof-Plan Construction
*Erica Melis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Exh. p. 4

## ANALOGY AND ABSTRACTION

Second-Order Matching modulo Evaluation—
A Technique for Reusing Proofs
*Thomas Kolbe and Christoph Walther* . . . . . . . . . . . 190

A Semantic Theory of Abstractions
*P. Pandurang Nayak and Alon Y. Levy* . . . . . . . . . . . 196

## ABDUCTION

Abductive Framework for Nonmonotonic
Theory Change
*Katsumi Inoue and Chiaki Sakama* . . . . . . . . . . . . . 204

Model-Based Diagnosis using Causal Networks
*Adnan Darwiche* . . . . . . . . . . . . . . . . . . . . . . . . . . 211

## SEARCH 1

Deadline Compliance, Predictability, and On-line
Optimization in Real-Time Problem Solving
*Babak Hamidzadeh and Shashi Shekhar* . . . . . . . . 220

k-Best: A New Method for Real-Time Decision Making
*Joseph C. Pemberton* . . . . . . . . . . . . . . . . . . . . . . 227

## SEARCH 2

How to Use Limited Memory in Heuristic Search
*Hermann Kaindl, Gerhard Kainz, Angelika Leeb,
and Harald Smetana* . . . . . . . . . . . . . . . . . . . . . . 236

Experimenting with Revisits in Game Tree Search
*Subir Bhattacharya* . . . . . . . . . . . . . . . . . . . . . . . 243

## SEARCH 3

On Bootstrapping Local Search with Trail-Markers
*Pang C. Chen* . . . . . . . . . . . . . . . . . . . . . . . . . . . 252

The Trailblazer Search with a Hierarchical Abstract Map
*Takahiro Sasaki, Fumihiko Chimura, and
Mario Tokoro* . . . . . . . . . . . . . . . . . . . . . . . . . . . 259

## SEARCH 4

From Approximate to Optimal Solutions: A Case Study
of Number Partitioning
*Richard E. Korf* . . . . . . . . . . . . . . . . . . . . . . . . . . 266

Best-First Fixed-Depth Game-Tree Search in Practice
*Aske Plaat, Jonathan Schaeffer, Wim Pijls, and
Arie de Bruin* . . . . . . . . . . . . . . . . . . . . . . . . . . . 273

## SATISFIABILITY 1

Theoretical Analysis of Davis-Putnam Procedure and
Propositional Satisfiability
*Nobuhiro Yugami* . . . . . . . . . . . . . . . . . . . . . . . . 282

On the Complexity of Extending Ground Resolution
with Symmetry Rules
*Thierry Boy de la Tour and Stéphane Demri* . . . . . . 289

## SATISFIABILITY 2

SEM: a System for Enumerating Models
*Jian Zhang and Hantao Zhang* . . . . . . . . . . . . . . . 298

Performance Test of Local Search Algorithms Using
New Types of Random CNF Formulas
*Byungki Cha and Kazuo Iwama* . . . . . . . . . . . . . . . 304

## OEFAULTS

Towards Efficient Default Reasoning
*Ilkka Niemelä* . . . . . . . . . . . . . . . . . . . . . . . . . . . 312

Default-Reasoning with Models
*Roni Khardon and Dan Roth* . . . . . . . . . . . . . . . . 319

## THEOREM PROVING 1

Extending Semantic Resolution via Automated
Model Building: applications
*Ricardo Caferra and Nicolas Peltier* . . . . . . . . . . . 328

Model Elimination, Logic Programming and
Computing Answers
*Peter Baumgartner, Ulrich Furbach, and
Frieder Stolzenburg* . . . . . . . . . . . . . . . . . . . . . . . 335

## THEOREM PROVING 2

Equality Elimination for the Inverse Method and
Extension Procedures
*Anatoli Degtyarev and Andrei Voronkov* . . . . . . . . . 342

Experiments with Associative-Commutative
Discrimination Nets
*Leo Bachmair, Ta Chen, I. V. Ramakrishnan,
Siva Anantharaman, and Jacques Chabin* . . . . . . . . 348

## REASONING ABOUT PROGRAMS

A Methodology for Proving Termination of General
Logic Programs
*Elena Marchiori* . . . . . . . . . . . . . . . . . . . . . . . . . 356

Unique Normal Forms and Confluence of Rewrite
Systems: Persistence
*Rakesh M. Verma* . . . . . . . . . . . . . . . . . . . . . . . . 362

# CASE BASED REASONING

## CASE BASED REASONING 1

Improving System Performance in Case-Based Iterative
Optimization through Knowledge Filtering
*Kazuo Miyashita and Katia Sycara* . . . . . . . . . . . . 371

Remembering To Forget: A Competence-Preserving
Case Deletion Policy for Case-Based Reasoning Systems
*Barry Smyth and Mark T. Keane* . . . . . . . . . . . . . 377

## CASE BASEO REASONING 2

Stratified Case-Based Reasoning: Reusing Hierarchical
Problem Solving Episodes
*L. Karl Branting and David W. Aha* . . . . . . . . . . . 384

Using Introspective Reasoning to Refine Indexing
*Susan Fox and David B. Leake* . . . . . . . . . . . . . . . 391

CASE BASED REASONING 3

Using CBR to Drive IR
  *Edwina L. Rissland and Jody J. Daniels* . . . . . . . . . . *400*

Within the Letter of the Law: open-textured planning
  *Kathryn E. Sanders* . . . . . . . . . . . . . . . . . . . . . . . . . *408*

# COGNITIVE MODELLING

COGNITIVE MODELLING 1

Optional Deep Case Filling and Focus Control with
Mental Images: ANTLIMA-KOREF
  *Anselm Blocher and Jörg R. J. Schirra* . . . . . . . . . . . *417*

A Microfeature Based Approach Towards
Metaphor Interpretation
  *Ron Sun* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *424*

COGNITIVE MOOELLING 2

Forgetting and Compacting data in Concept Learning
  *Gunther Sablon and Luc De Raedt* . . . . . . . . . . . . . . *432*

Determining what to learn through component-
task modeling
  *Bruce Krulwich, Larry Birnbaum, and
  Gregg Collins* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *439*

COGNITIVE MOOELLING 3

Using Information Content to Evaluate Semantic
Similarity in a Taxonomy
  *Philip Resnik* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *448*

On Heuristic Reasoning, Reactivity, and Search
  *Susan L. Epstein* . . . . . . . . . . . . . . . . . . . . . . . . . . . *454*

COGNITIVE MODELLING 4

Action and Perception in Man-Made Environments
  *Daniel D. Fu, Kristian J. Hammond, and
  Michael J. Swain* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *464*

# CONNECTIONIST MODELS

CONNECTIONIST MODELS 1

Kanerva's Sparse Distributed Memory: An
Object-Oriented Implementation on the Connection
Machine
  *Andreas Turk and Günther Görz* . . . . . . . . . . . . . . . *473*

Understanding Neural Networks via Rule Extraction
  *Rudy Setiono and Huan Liu* . . . . . . . . . . . . . . . . . . . *480*

CONNECTIONIST MOOELS 2

GR2—A Hybrid Knowledge-based System Using
General Rules
  *Zhe Ma, Robert F. Harrison, and
  R. Lee Kennedy* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *488*

A Hybrid Fuzzy-Neural Expert System for Diagnosis
  *Christoph S. Herrmann* . . . . . . . . . . . . . . . . . . . . . . *494*

CONNECTIONIST MODELS 3

A Hybrid Rule-based System: How Variables are
Involved in Connectionist Rule-based Systems
  *Fukumi Kozato* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *502*

Learning Distributed Representations for the
Classification of Terms
  *Alessandro Sperduti, Antonina Starita, and
  Christoph Goller* . . . . . . . . . . . . . . . . . . . . . . . . . . . *509*

CONNECTIONIST MOELS 4

A Novelty Detection Approach to Classification
  *Nathalie Japkowicz, Catherine Myers, and
  Mark Gluck* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *518*

Combining the Predictions of Multiple Classifiers:
Using Competitive Learning to Initialize Neural
Networks
  *Richard Maclin and Jude W. Shavlik* . . . . . . . . . . . . *524*

CONNECTIONIST MODELS 5

A Model for Hormonal Modulation of Learning
  *Hiroaki Kitano* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *532*

# CONSTRAINT SATISFACTION

CONSTRAINT SATISFACTION 1

A Theoretical Evaluation of Selected
Backtracking Algorithms
  *Grzegorz Kondrak and Peter van Beek* . . . . . . . . . . *541*

Extracting Constraint Satisfacion Subproblems
  *Eugene C. Freuder and Paul D. Hubbe* . . . . . . . . . . *548*

CONSTRAINT SATISFACTION 2

On the Space-Time Trade-off in Solving Constraint
Satisfaction Problems
  *Roberto J. Bayardo, Jr. and Daniel P. Miranker* . . . . . *558*

Generalizing Inconsistency Learning for
Constraint Satisfaction
  *Eugene C. Freuder and Richard J. Wallace* . . . . . . . . *563*

CONSTRAINT SATISFACTION 3

Look-ahead value ordering for constraint
satisfaction problems
  *Daniel Frost and Rina Dechter* . . . . . . . . . . . . . . . . *572*

Constraint Satisfaction as Global Optimization
  *Pedro Meseguer and Javier Larrosa* . . . . . . . . . . . . . *579*

CONSTRAINT SATISFACTION 4

Increasing Functional Constraints Need to Be
Checked Only Once
  *Bing Liu* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *586*

Using Inference to Reduce Arc Consistency
Computation
  *Christian Bessière, Eugene C. Freuder, and
  Jean-Charles Régin* . . . . . . . . . . . . . . . . . . . . . . . . . *592*

CONSTRAINT SATISFACTION 5

A Theoretical and Experimental Comparison
of Constraint Propagation Techniques for
Disjunctive Scheduling
  *Philippe Baptiste and Claude Le Pape* . . . . . . . . . . . . 600
Limited Discrepancy Search
  *William D. Harvey and Matthew L. Ginsberg* . . . . . . 607

CONSTRAINT SATISFACTION 6

GSAT and Local Consistency
  *Kalev Kask and Rina Dechter* . . . . . . . . . . . . . . . . . . 616

CONSTRAINT SATISFACTION 7

Constraint Solving over Semirings
  *Stefano Bistarelli, Ugo Montanari, and
  Francesca Rossi* . . . . . . . . . . . . . . . . . . . . . . . . . . . 624
Valued Constraint Satisfaction Problems: Hard and
Easy Problems
  *Thomas Schiex, Hélène Fargier, and
  Gérard Verfaillie* . . . . . . . . . . . . . . . . . . . . . . . . . . . 631

CONSTRAINT SATISFACTION 8

Composition in Hierarchical CLP
  *Michael Jampel and Sebastian Hunt* . . . . . . . . . . . . 640
Sparse Constraint Graphs and Exceptionally
Hard Problems
  *Barbara M. Smith and Stuart A. Grant* . . . . . . . . . . 646

## DISTRIBUTED AI

COALITIONS

Task allocation via coalition formation among
autonomous agents
  *Onn Shehory and Sarit Kraus* . . . . . . . . . . . . . . . . . 655
Coalition Formation among Bounded Rational Agents
  *Tuomas W. Sandholm and Victor R. Lesser* . . . . . . . 662

MULTIPLE AGENTS 1

Matchmaking for Information Agents
  *Daniel Kuokka and Larry Harada* . . . . . . . . . . . . . . 672
Deriving Multi-Agent Coordination through
Filtering Strategies
  *Eithan Ephrati, Martha E. Pollack, and
  Sigalit Ur* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 679

MULTIPLE AGENTS 2

Flexible social laws
  *Will Briggs and Diane Cook* . . . . . . . . . . . . . . . . . . 688
Equilibrium Analysis of the Possibilities of Unenforced
Exchange in Multiagent Systems
  *Tuomas W. Sandholm and Victor R. Lesser* . . . . . . . 694

OISTRIBUTED PLANNING

The Semantics of Intention Maintenance for
Rational Agents
  *Michael P. Georgeff and Anand S. Rao* . . . . . . . . . . 704
Social Dilemmas in Computational Ecosystems
  *Tad Hogg* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 711

## GENETIC ALGORITHMS

GENETIC ALGORITHMS 1

Hybrid Learning Using Genetic Algorithms and
Decision Trees for Pattern Classification
  *J. Bala, J. Huang, H. Vafaie, K. DeJong, and
  H. Wechsler* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 719
A genetic prototype learner
  *Sandip Sen and Leslie Knight* . . . . . . . . . . . . . . . . . 725

GENETIC ALGORITHMS 2

Gene Duplication to Enable Genetic Programming
to Concurrently Evolve Both the Architecture and
Work-Performing Steps of a Computer Program
  *John R. Koza* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 734
The Automatic Programming of Agents that Learn
Mental Models and Create Simple Plans of Action
  *David Andre* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 741

## KNOWLEDGE BASE TECHNOLOGY

KNOWLEDGE BASE TECHNOLOGY 1

Knowledge Representation in the Large
  *Peter D. Karp and Suzanne M. Paley* . . . . . . . . . . . . 751
Efficient Algorithms and Performance Results for
Multi-User Knowledge Bases
  *Vinay K. Chaudhri and John Mylopoulos* . . . . . . . . . 759

KNOWLEDGE BASE TECHNOLOGY 2

The Generic Frame Protocol
  *Peter D. Karp, Karen L. Myers, and Tom Gruber* . . . . 768
Knowledge-Based Anytime Computation
  *Abdel-illah Mouaddib and Shlomo Zilberstein* . . . . . . 775

PLANNING, MONITORING, AND CONTROL

Proposing Measurements in Dynamic Systems
  *Johann Gamper and Wolfgang Nejdl* . . . . . . . . . . . . . 784
Synthesizing Planr Controllers Using Real-time Goals
  *M. Barbeau, F. Kabanza, and R. St-Denis* . . . . . . . . . 791

## KNOWLEDGE REPRESENTATION

OESCRIPTION LOGICS

What's in an Aggregate: Foundations for Description
Logics with Tuples and Sets
  *Giuseppe De Giacomo and Maurizio Lenzerini* . . . . . . 801

Terminological Logics with Modal Operators
  *Franz Baader and Armin Laux* . . . . . . . . . . . . . . . . . *808*

EXPLANATION

Explaining Subsumption in Description Logics
  *Deborah L. McGuinness and*
  *Alexander T. Borgida* . . . . . . . . . . . . . . . . . . . . . . *816*

Determining Explanations using Transmutations
  *Mary-Anne Williams, Maurice Pagnucco,*
  *Norman Foo, and Brailey Sims* . . . . . . . . . . . . . . . *822*

KNOWLEDGE COMPILATION

An Analysis of Approximate Knowledge Compilation
  *Alvaro del Val* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *830*

Knowledge Compilation Using Theory
Prime Implicates
  *Pierre Marquis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *837*

COMMONSENSE KNOWLEDGE

Toward a Geometry of Common Sense: A Semantics
and a Complete Axiomatization of Mereotopology
  *Nicholas Asher and Laure Vieu* . . . . . . . . . . . . . . *846*

A Logical Account of Relevance
  *Gerhard Lakemeyer* . . . . . . . . . . . . . . . . . . . . . . . . *853*

COMPLEXITY

The Comparative Linguistics of
Knowledge Representation
  *Goran Gogic, Henry Kautz, Christos Papadimitriou,*
  *and Bart Selman* . . . . . . . . . . . . . . . . . . . . . . . . . . . *862*

Semantics and Complexity of Abduction from
Default Theories
  *Thomas Eiter, Georg Gottlob, and Nicola Leone* . . . . . *870*

DIAGRAMS

Inter-diagrammatic Reasoning
  *Michael Anderson and Robert McCartney* . . . . . . . . . *878*

Qualitative Structural Analysis Using
Diagrammatic Reasoning
  *Shirley Tessler, Yumi Iwasaki, and Kincho Law* . . . . . *885*

SPATIAL REASONING

An algebraic approach to granularity in qualitative time
and space representation
  *Jérôme Euzenat* . . . . . . . . . . . . . . . . . . . . . . . . . . . *894*

Topological Inference
  *Michelangelo Grigni, Dimitris Papadias, and*
  *Christos Papadimitriou* . . . . . . . . . . . . . . . . . . . . . *901*

SHAPE AND SPACE

Utilizing Moment Invariants and Gröbner Bases
to Reason About Shapes
  *Haim Schweitzer and Janell Straach* . . . . . . . . . . . . *908*

A Qualitative Discretization for Two-Body Contacts
  *Amitabha Mukerjee, Manish Agarwal, and*
  *Praveen Bhatia* . . . . . . . . . . . . . . . . . . . . . . . . . . . *915*

INFORMATION GATHERING

Letizia: An Agent That Assists Web Browsing
  *Henry Lieberman* . . . . . . . . . . . . . . . . . . . . . . . . . *924*

Category Translation: Learning to understand
information on the Internet
  *Mike Perkowitz and Oren Etzioni* . . . . . . . . . . . . . . *930*

**AWARDS**

RESEARCH EXCELLENCE AWARD

Explaining the Ineffable: AI on the Topics of Intuition,
Insight and Inspiration
  *Herbert A. Simon, Carnegie Mellon University* . . . . . . *939*

COMPUTERS AND THOUGHT AWARD

Rationality and Intelligence
  *Stuart Russell, University of California, Berkeley* . . . . . *950*

**INVITED SPEAKERS**

Profiling Communication in Distributed
Genetic Algorithms
  *Jonathan Maresky, Yuval Davidor, Daniel Gitler,*
  *Gad Aharoni, and Amnon Barak, The Hebrew*
  *University of Jerusalem* . . . . . . . . . . . . . . . . . . . . . *961*

Agents on Stage: Advancing the State of the Art of AI
  *Barbara Hayes-Roth, Stanford University* . . . . . . . . . *967*

Turing Test Considered Harmful
  *Patrick Hayes, Beckman Institute, and Kenneth Ford,*
  *University of West Florida* . . . . . . . . . . . . . . . . . . . *972*

Vive la difference! Individualised interaction with users
  *Judy Kay, University of Sydney* . . . . . . . . . . . . . . . . *978*

Biologically Inspired Defenses Against Computer Viruses
  *Jeffrey O. Kephart, Gregory B. Sorkin,*
  *William C. Arnold, David M. Chess,*
  *Gerald J. Tesauro, and Steve R. White,*
  *IBM Thomas J. Watson Research Center* . . . . . . . . . . *985*

Inductive Logic Programming: Inverse Resolution
and Beyond
  *Stephen Muggleton, Oxford University Computing*
  *Laboratory* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *997*

Stochastic Search and Phase Transitions:
AI Meets Physics
  *Bart Selman, AT&T Bell Laboratories* . . . . . . . . . . . *998*

Modeling Living Systems for Computer Vision
  *Demetri Terzopoulos, University of Toronto* . . . . . . . *1003*

AUTHOR INDEX . . . . . . . . . . . . . . . . . . . . . . . . . . . . *1015*

Exh. p. 8

# Letizia: An Agent That Assists Web Browsing

**Henry Lieberman**
Media Laboratory
Massachusetts Institute of Technology
Cambridge, MA, USA
lieber@media.mit.edu



## 1 Introduction

"Letizia Álvarez de Toledo has observed that this vast library is useless: rigorously speaking, a *single volume* would be sufficient, a volume of ordinary format, printed in nine or ten point type, containing an infinite number of infinitely thin leaves."

- Jorge Luis Borges, *The Library of Babel*

The recent explosive growth of the World Wide Web and other on-line information sources has made critical the need for some sort of intelligent assistance to a user who is browsing for interesting information.

Past solutions have included automated searching programs such as WAIS or Web crawlers that respond to explicit user queries. Among the problems of such solutions are that the user must explicitly decide to invoke them, interrupting the normal browsing process, and the user must remain idle waiting for the search results.

This paper introduces an agent, *Letizia*, which operates in tandem with a conventional Web browser such as Mosaic or Netscape. The agent tracks the user's browsing behavior -- following links, initiating searches, requests for help -- and tries to anticipate what items may be of interest to the user. It uses a simple set of heuristics to model what the user's browsing behavior might be. Upon request, it can display a page containing its current recommendations, which the user can choose either to follow or to return to the conventional browsing activity.

## 2 Interleaving browsing with automated search

The model adopted by Letizia is that the search for information is a cooperative venture between the human user and an intelligent software agent. Letizia and the user both browse the same search space of linked Web documents, looking for "interesting" ones. No goals are predefined in advance. The difference between the user's search and Letizia's is that the user's search has a reliable static evaluation function, but that Letizia can explore search alternatives faster than the user can. Letizia uses the past behavior of the user to anticipate a rough approximation of the user's interests.

### Abstract

Letizia is a user interface agent that assists a user browsing the World Wide Web. As the user operates a conventional Web browser such as Netscape, the agent tracks user behavior and attempts to anticipate items of interest by doing concurrent, autonomous exploration of links from the user's current position. The agent automates a browsing strategy consisting of a best-first search augmented by heuristics inferring user interest from browsing behavior.

Exh. p. 9

Critical to Letizia's design is its control structure, in which the user can manually browse documents and conduct searches, without interruption from Letizia. Letizia's role during user interaction is merely to observe and make inferences from observation of the user's actions that will be relevant to future requests.

In parallel with the user's browsing, Letizia conducts a resource-limited search to anticipate the possible future needs of the user. At any time, the user may request a set of recommendations from Letizia based on the current state of the user's browsing and Letizia's search. Such recommendations are dynamically recomputed when anything changes or at the user's request.

Letizia is in the tradition of *behavior-based* interface agents [Maes 94], [Lashkari, Metral, and Maes 94]. Rather than rely on a preprogrammed knowledge representation structure to make decisions, the knowledge about the domain is incrementally acquired as a result of inferences from the user's concrete actions.

Letizia adopts a strategy that is midway between the conventional perspectives of *information retrieval* and *information filtering* [Sheth and Maes 93]. Information retrieval suggests the image of a user actively querying a base of [mostly irrelevant] knowledge in the hopes of extracting a small amount of relevant material. Information filtering paints the user as the passive target of a stream of [mostly relevant] material, where the task is to remove or de-emphasize less relevant material. Letizia can interleave both retrieval and filtering behavior initiated either by the user or by the agent.

## 3 Modeling the user's browsing process

The user's browsing process is typically to examine the current HTML document in the Web browser, decide which, if any, links to follow, or to return to a document previously encountered in the history, or to return to a document explicitly recorded in a *hot list*, or to add the current document to the hot list.

The goal of the Letizia agent is to automatically perform some of the exploration that the user would have done while the user is browsing these or other documents, and to evaluate the results from what it can determine to be the user's perspective. Upon request, Letizia provides recommendations for further action on the user's part, usually in the form of following links to other documents.

Letizia's leverage comes from overlapping search and evaluation with the "idle time" during which the user is reading a document. Since the user is almost always a better judge of the relevance of a document than the system, it is usually not worth making the user wait for the result of an automated retrieval if that would interrupt the browsing process. The best use of Letizia's recommendations is when the user is unsure of what to do next. Letizia never takes control of the user interface, but just provides suggestions.

Because Letizia can assume to be operating in a situation where the user has invited its assistance, its simulation of the user's intent need not be extremely accurate for it to be useful. Its guesses only need be better than no guess at all, and so even weak heuristics can be employed.

## 4 Inferences from the user's browsing behavior

Observation of the user's browsing behavior can tell the system much about the user's interests. Each of these heuristics is weak by itself, but each can contribute to a judgment about the document's interest.

One of the strongest behaviors is for the user to save a reference to a document, explicitly indicating interest. Following a link can indicate one of several things. First, the decision to follow a link can indicate interest in the topic of the link. However, because the user does not know what is referenced by the link at the time the decision to follow it has been made, that indication of interest is tentative, at best. If the user returns immediately without having either saved the target document, or followed further links, an indication of disinterest can be assumed. Letizia saves the user considerable time that would be wasted exploring those "dead-end" links.

Following a link is, however, a good indicator of interest in the document *containing* the link. Pages that contain lots of links that the user finds worth following are interesting. Repeatedly returning to a document also connotes interest, as would spending a lot of time browsing it [relative to its length], if we tracked dwell time.

Since there is a tendency to browse links in a top-to-bottom, left-to-right manner, a link that has been "passed over" can be assumed to be less interesting. A link is passed over if it remains unchosen while the user chooses other links that appear later in the document. Later choice of that link can reverse the indication.

Letizia does not have natural language understanding capability, so its content model of a document is simply as a list of keywords. Partial natural language capabilities that can extract some grammatical and semantic information quickly, even though they do not perform full natural language understanding [Lehnert 93] could greatly improve its accuracy.

Letizia uses an extensible object-oriented architecture to facilitate the incorporation of new heuristics to determine interest in a document, dependent on the user's actions, history, and the current interactive context as well as the content of the document.







User browses many pages having to do with "Agents".
System infers interest in the topic "Agent".

An important aspect of Letizia's judgment of "interest" in a document is that it is not trying to determine some measure of how interesting the document is in the abstract, but instead, a *preference* ordering of interest among a set of links. If almost every link is found to have high interest, then an agent that recommends them all isn't much help, and if very few links are interesting, then the agent's recommendation isn't of much consequence. At each moment, the primary problem the user is faced with in the browser interface is "which link should I choose next?", And so it is Letizia's job to recommend which of the several possibilities available is most likely to satisfy the user. Letizia sets as its goal to recommend a certain *percentage* [settable by the user] of the links currently available.



Later, the user independently browses a personal Web page, with a publications list. Letizia recommends articles having to do with "Agents".

Exh. p. 11

## 5 An example

In the example, the user starts out by browsing home pages for various general topics such as Artificial Intelligence. Our user is particularly interested in topics involving Agents, so he or she zeros in on pages that treat that topic, such as the general Agent Info page, above. Many pages will have the word Agent in the name, the user may search for the word Agent in a search page, etc. and so the system can infer an interest in the topic of Agents from the browsing behavior.

At a later time, the user is browsing personal home pages, perhaps reached through an entirely different route. A personal home page for an author may contain a list of that author's publications. As the user is browsing through some of the publications, Letizia can concurrently be scanning the list of publications to find which ones may have relevance to a topic for which interest was previously inferred, in this case the topic Agents. Those papers in the publication list dealing with agents are suggested by Letizia.

Letizia can also explain why it has chosen that document. In many instances, this represents not the only reason for having chosen it, but it selects one of the stronger reasons to establish plausibility. In this case, it noticed a keyword from a previous exploration, and in the other case, a comparison was made to a document that also appeared in the list returned by the bibliography search.

## 6 Persistence of interest

One of the most compelling reasons to adopt a Letizia-like agent is the phenomenon of *persistence of interest*. When the user indicates interest by following a link or performing a search on a keyword, their interest in that topic rarely ends with the returning of results for that particular search.

Though the user typically continues to be interested in the topic, he or she often cannot take the time to restate interest at every opportunity, when another link or search opportunity arises with the same or related subject. Thus the agent serves the role of remembering and looking out for interests that were expressed with past actions.



Persistence of interest is also valuable in capturing users' preferred personal strategies for finding information. Many Web nodes have both subject-oriented and person-oriented indices. The Web page for a university or company department typically contains links to the major topics of the department's activity, and also links to the home pages of the department's personnel. A particular piece of work may be linked to by both the subject and the author.

Some users may habitually prefer to trace through personal links rather than subject links, because they may already have friends in the organization or in the field, or

just because they may be more socially oriented in general. An agent such as Letizia picks up such preferences, through references to links labeled as "People", or through noticing particular names that may appear again and again in different, though related, contexts.

Indications of interest probably ought to have a factor of decaying over time so that the agent does not get clogged with searching for interests that may indeed have fallen from the user's attention. Some actions may have been highly dependent upon the local context, and should be forgotten unless they are reinforced by more recent action. Another heuristic for forgetting is to discount suggestions that were formulated very far in "distance" from the present position, measured in number of web links from the original point of discovery.

Further, persistence of interest is important in uncovering *serendipitous connections*, which is a major goal of information browsing. While searching for one topic, one might accidentally uncover information of tremendous interest on another, seemingly unrelated, topic. This happens surprisingly often, partly because seemingly unrelated topics are often related through non-obvious connections. An important role for the agent to play is in constantly being available to notice such connections and bring them to the user's attention.

## 7 Search strategies

The interface structure of many Web browsers encourages depth first search, since every time one descends a level the choices at the next lower level are immediately displayed. One must return to the containing document to explore brother links at the same level, a two-step process in the interface. When the user is exploring in a relatively undirected fashion, the tendency is to continue to explore downward links in a depth-first fashion. After a while, the user finds him or herself very deep in a stack of previously chosen documents, and [especially in the absence of much visual representation of the context] this leads to a "lost in hyperspace" feeling.

The depth-first orientation is unfortunate, as much information of interest to users is typically embedded rather shallowly in the Web hierarchy. Letizia compensates for this by employing a breadth-first search. It achieves utility in part by reminding users of neighboring links that might escape notice. It makes user exploration more efficient by automatically eliding many of the "dead-end" links that waste users' time.

The depth of Letizia's search is also limited in practice by the effects of user interaction. Web pages tend to be of relatively similar size in terms of amount of text and number of links per page, and users tend to move from one Web node to another at relatively constant intervals. Each user movement immediately refocuses the search, which prevents it from getting too far afield.

The search is still potentially combinatorially explosive, so we put a resource limitation on search activity. This limit is expressed as a maximum number of accesses to non-local Web nodes per minute. After that

number is reached, Letizia remains quiescent until the next user-initiated interaction.

Letizia will not initiate further searches when it reaches a page that contains a search form, even though it could benefit enormously by doing so, in part because there is as yet no agreed-upon Web convention for time-bounding the search effort. Letizia will, however, recommend that a user go to a page containing a search form.

In practice, the pacing of user interaction and Letizia's internal processing time tends to keep resource consumption manageable. Like all autonomous Web searching "robots", there exists the potential for overloading the net with robot-generated communication activity. We intend to adhere to conventions for "robot exclusion" and other "robot ethics" principles as they are agreed upon by the network community.

## 8 Related work

Work on intelligent agents for information browsing is still in its infancy. The closest work to this is [Armstrong, et. al. 95], especially in the interface aspects of annotating documents that are being browsed independently by the user. Letizia differs in that it does not require the user to state a goal at the outset, instead trying to infer "goals" implicitly from the user's browsing behavior. Also quite relevant is [Balabonovic and Shoham 95], which requires the user to explicitly evaluate pages. Again, we try to infer evaluations from user actions. Both explicit statements of goals and explicit evaluations of the results of browsing actions do have the effect of speeding up the learning algorithm and making it more predictable, at the cost of additional user interaction.

[Etzioni and Weld 94], [Knoblock and Arens 93], and [Perkowitz and Etzioni 95] are examples of a knowledge-intensive approach, where the agent is pre-programmed with an extensive model of what resources are available on the network and how to access them. The knowledge-based approach is complementary to the relatively pure behavior-based approach here, and they could be used together.

Automated "Web crawlers" [Koster 94] have neither the knowledge-based approach nor the interactive learning approach,. They use more conventional search and indexing techniques. They tend to assume a more conventional question-and-answer interface mode, where the user delegates a task to the agent, and then waits for the result. They don't have any provision for making use of concurrent browsing activity or learning from the user's browsing behavior.

Laura Robin [Robin 90] explored using an interactive, resource-limited, interest-dependent best-first search in a browser for a linked multimedia environment. Some of the ideas about control structure were also explored in a different context in [Lieberman 89].

# 9 Implementation

Letizia is implemented in Macintosh Common Lisp. It uses Netscape as a Web browser and user interface. The agent runs as a separate process, and communication between Lisp and Netscape takes place using AppleEvents and AppleScript interprocess communication. Currently, we are severely limited by the extent to which Netscape is programmable via AppleEvents. HTML is parsed using the Zebu parser-generator [Laubsch 94].

## Acknowledgments

This work has been supported in part by research grants to the MIT Media Laboratory from Alenia, ARPA/JNIDS, Apple Computer, the National Science Foundation, and other Media Lab sponsors.

## References

[Armstrong, Freytag, Joachims and Mitchell 95] Robert Armstrong, Dayne Freitag, Thorsten Joachims and Tom Mitchell, WebWatcher: A Learning Apprentice for the World Wide Web, in *AAAI Spring Symposium on Information Gathering*, Stanford, CA, March 1995.

[Balabonovic and Shoham 95] Marko Balabanovic and Yoav Shoham, Learning Information Retrieval Agents: Experiments with Automated Web Browsing, in *AAAI Spring Symposium on Information Gathering*, Stanford, CA, March 1995.

[Etzioni and Weld 94] Oren Etzioni and Daniel Weld, A Softbot-Based Interface to the Internet, *Communications of the ACM*, July 1994.

[Knoblock and Arens 93] Craig Knoblock and Yigal Arens, An Architecture for Information Retrieval Agents, *AAAI Symposium on Software Agents*, Stanford, CA, March 1993.

[Koster 94] M. Koster, World Wide Web Wanderers, Spiders and Robots, http:// web.nexor.co.uk/ mak/doc/robots/robots.html

[Lashkari, Metral, and Maes 94] Yezdi Lashkari, Max Metral, Pattie Maes, Collaborative Interface Agents, *Conference of the American Association for Artificial Intelligence*, Seattle, August 1994.

[Laubsch 94] Zebu: A Tool for Specifying Reversible LALR(1) Parsers, Hewlett-Packard Laboratories, 1994.

[Lehnert and Sundheim 91] Wendy Lehnert and B. Sundheim, A Performance Evaluation of Text-Analysis Technologies," *AI Magazine*, p. 81-94., 1991

[Lieberman 89] Henry Lieberman, Parallelism in Interpreters for Knowledge Representation Systems, in *Concepts and Characteristics of Knowledge-Based Systems*, M. Tokoro, Y. Anzai, A. Yonezawa, eds., North-Holland, 1989.

[Maes 94] Pattie Maes, Agents that Reduce Work and Information Overload, *Communications of the ACM*, July 1994.

[Perkowitz and Etzioni 95] Mike Perkowitz and Oren Etzioni, Category Translation: Learning to Understand Information on the Internet, *International Joint Conference on Artificial Intelligence*, Montréal, August 1995.

[Robin 90] Robin, Laura, Personalizing Hypermedia: The Role of Adaptive Multimedia Scripts, MS Thesis, Massachusetts Institute of Technology, 1990.

[Sheth and Maes 93] Beerud Sheth and Pattie Maes, Evolving Agents for Personalized Information Filtering, *IEEE Conference on Artificial Intelligence for Applications*, 1993.

# Exh. 1004



## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:  Gary Odom

Application No.:  09/796,235

Filed:  02/28/2001

For:  Automatic directory supplementation

Examiner:  William D. Hutton, Jr.

Art Unit:  2179

Date:  February 14, 2005


Mail Stop AF
Commissioner for Patents
Box 1450
Alexandria, VA 22313-1450

### NOTICE OF APPEAL FROM THE EXAMINER
### TO THE BOARD OF PATENT APPEALS AND INTERFERENCES

Gary Odom hereby appeals to the Board from the decision of Examiner William D. Hutton, Jr. mailed January 26, 2005, finally rejecting claims 9-30.

If an extension of time is required for filing this Notice of Appeal, please consider this a petition therefor.

A triplicate copy of this Notice of Appeal is enclosed.

The $250.00 fee per 37 C.F.R. § 1.17 (b) for filing this Notice of Appeal is enclosed as a credit card form. Please charge any additional fees that may be required in connection with filing this Notice of Appeal and any extension of time, or credit any overpayment, to the credit card on the enclosed credit card form.


Respectfully,

Gary Odom
15505 SW Bulrush Lane, Tigard, OR 97223
telephone:    (503) 524-8371
fax:            (775) 942-8525

02/22/2005 MAHMED1  00000048 09796235
01 FC:2401              250.00 OP

Iron Dome, Exh. 1004



Application No.: 09/796,235
Filed:            02/28/2001
Group Art Unit:   2179

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE BOARD OF PATENT APPEALS AND INTERFERENCES

Regarding the application:

Title: Automatic directory supplementation

Number:   09/796,235

Priority:  02/28/2001

Examiner:  William Hutton, Jr.

Art Unit:   2179

---

Mail Stop Appeal Brief-Patents
Commissioner for Patents
Box 1450
Alexandria, VA 22313-1450

### BRIEF FOR APPELLANT

This is an appeal from the Examiner's January 26, 2005 final rejection.

### 1. REAL PARTY IN INTEREST

Gary Odom, appellant, is the real party in interest.

### 2. RELATED APPEALS AND INTERFERENCES

There are no related appeals or interferences.

### 3. STATUS OF CLAIMS

Appeal is sought for rejection of claims 9-24, 27-29. Claims 25-26, and 30 are herein canceled. Claim 31 is objected to as being dependent upon a rejected base claim.

### 4. STATUS OF AMENDMENTS

No amendment has been filed subsequent to final rejection.

02/22/2005 MAKME01  00000049 09796235
01 FC:2402                    250.00 OP

Exh. p. 2

Application No.: 09/796,235
Filed:            02/28/2001
Group Art Unit: 2179

## 5. SUMMARY OF INVENTION

09/796,235 describes an autonomous search mechanism, solving the problem of finding similar documents to ones already known without any user effort whatsoever. The only precondition to initiating the claimed process is user placement of one or more documents in a file system directory as reference material for guiding the search.

09/796,235 is fairly characterized as lazy because time is not of the essence. A user doesn't initiate search: the process works in the background, without arousing expectation of quick results.

As an exemplary use-case scenario, a user browses the web, saving topically-related document links in the same web-favorites folder. Once this precondition is met, the claimed invention software kicks in: deriving keywords from the saved documents, thus discerning the topic of interest, then searching for other related documents, resulting in supplementing the directory with newly-found documents - hence the title of 09/796,235: "automatic directory supplementation".

## 6. ISSUES

There was but one overall issue in Examiner's January 26, 2005 final rejection: 35 U.S.C. §103 combination reference anticipation by prior art.

Appellant respectfully contends:

Essential features of the prior art itself were mischaracterized as bases for rejection.

The references, even combined, fail to anticipate all limitations of the claims.

Used as bases for rejection, the necessary combination of references, or applying specific features of one reference with another, comprise a non-obvious combination. The cited prior art references themselves provide no suggestion of combination. Respectfully, Examiner applied impermissible hindsight, without regard to prior art teaching or motivation.

With all due respect, there appears a lapse in considering the claims and prior art holistically, instead treating claim limitations and prior art reference features as dissectible components, without proper regard for context.

Exh. p. 3

Application No.: 09/796,235
Filed:          02/28/2001
Group Art Unit:  2179

## 7. GROUPING OF CLAIMS

On the whole, from a viewpoint of patentability, of claims standing or falling together, there is but one group.

## 8. ARGUMENT

### Statutory and case law bases for determining whether a preamble limits a claim

MPEP 2111.02 discusses preamble statements limiting structure or intended use. The meaning MPEP 2111.02 and case law are plain and clear that a preamble may limit claim scope. Examiner cited the same quotation. Preamble claim limitation may of course be supported by example within the claim body.

MPEP 2111.02 - Any terminology in the preamble that limits the structure of the claimed invention must be treated as a claim limitation. See, e.g., Corning Glass Works v. Sumitomo Elec. U.S.A., Inc., 868 F.2d 1251, 1257, 9 USPQ2d 1962, 1966 (Fed. Cir. 1989).

"[A] claim preamble has the import that the claim as a whole suggests for it." Bell Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615, 820, 34 USPQ2d 1816, 1820 (Fed. Cir. 1995). "If the claim preamble, when read in the context of the entire claim, recites limitations of the claim, or, if the claim preamble is `necessary to give life, meaning, and vitality' to the claim, then the claim preamble should be construed as if in the balance of the claim." Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305, 51 USPQ2d 1161, 1165-66 (Fed. Cir. 1999). See also Kropa v. Robie, 187 F.2d 150, 152, 88 USPQ 478, 481 (CCPA 1951)

Specific arguments related to rejection and preamble limitation are discussed in the below section titled: "Unanticipated limitations for all claims".

### Statutory and case law bases for 35 U.S.C. §103 rejections based upon prior art combinations

The consistency of the below quotations edify criteria for obviousness rejection via 35 U.S.C. §103 using a combination of references.

Application No.: 09/796,235
Filed:           02/28/2001
Group Art Unit: 2179

I. The prior art references themselves must suggest combination. Failing explicit self-suggestion, the prior art must provide the motivation for obviousness in combination. Such motivation may be found by considering the references holistically. If the purpose / problem being solved ("nature of the problem"), function and structure of the prior art references are aligned, one may reasonably conclude combination of the references obvious, as no differences exist in the principles of operation between the references. The burden of meeting this criterion by logical exposition belongs to the Examiner.

3. To combine references without evidentiary support by the prior art constitutes impermissible hindsight. Combination of prior art with different principles of operation is impermissible. An Examiner cannot simply assert 'well within the ordinary skill of the art at the time the claimed invention was made'.

4. To be construed anticipatory, the prior art must teach or at least suggest all claim limitations, whether such limitations appears in the preamble or body of a claim.

5. The final test is comparing the claimed invention as a whole to a prior art reference. Claim limitations are not puzzle pieces to be matched to atomized prior art reference suggestions, and thus examined out of context. As with obviousness in combining prior art references, only if the prior art aligns with the claimed invention in principles of operation may a prior art reference be considered anticipatory.

MPEP 2143 -To establish a prima facie case of obviousness, three basic criteria must be met. First, there must be some suggestion or motivation, either in the references themselves or in the knowledge generally available to one of ordinary skill in the art, to modify the reference or to combine reference teachings. Second, there must be a reasonable expectation of success. Finally, the prior art reference (or references when combined) must teach or suggest all the claim limitations. The teaching or suggestion to make the claimed combination and the reasonable expectation of success must both be found in the prior art, not in applicant's disclosure. In re Vaeck, 947 F.2d 488, 20 USPQ2d 1438 (Fed. Cir. 1991).

The initial burden is on the examiner to provide some suggestion of the desirability of doing what the inventor has done. "To support the conclusion that the claimed invention is directed to obvious subject matter, either the references must expressly

Application No.:  09/796,235
Filed:           02/28/2001
Group Art Unit:  2179

or impliedly suggest the claimed invention or the examiner must present a convincing line of reasoning as to why the artisan would have found the claimed invention to have been obvious in light of the teachings of the references." Ex parte Clapp, 227 USPQ 972, 973 (Bd. Pat. App. & Inter. 1985).

When applying 35 U.S.C. 103, the following tenets of patent law must be adhered to:

(A) The claimed invention must be considered as a whole;

(B) The references must be considered as a whole and must suggest the desirability and thus the obviousness of making the combination;

(C) The references must be viewed without the benefit of impermissible hindsight vision afforded by the claimed invention; and

(D) Reasonable expectation of success is the standard with which obviousness is determined.

Hodosh v. Block Drug Co., Inc., 786 F.2d 1136, 1143 n.5, 229 USPQ 182, 187 n.5 (Fed. Cir. 1986).

Obviousness can only be established by combining or modifying the teachings of the prior art to produce the claimed invention where there is some teaching, suggestion, or motivation to do so found either explicitly or implicitly in the references themselves or in the knowledge generally available to one of ordinary skill in the art. "The test for an implicit showing is what the combined teachings, knowledge of one of ordinary skill in the art, and the nature of the problem to be solved as a whole would have suggested to those of ordinary skill in the art." In re Kotzab, 217 F.3d 1365, 1370, 55 USPQ2d 1313, 1317 (Fed. Cir. 2000). See also In re Lee, 277 F.3d 1338, 1342-44, 61 USPQ2d 1430, 1433-34 (Fed. Cir. 2002) (discussing the importance of relying on objective evidence and making specific factual findings with respect to the motivation to combine references); In re Fine, 837 F.2d 1071, 5 USPQ2d 1596 (Fed. Cir. 1988); In re Jones, 958 F.2d 347, 21 USPQ2d 1941 (Fed. Cir. 1992).

The mere fact that references can be combined or modified does not render the resultant combination obvious unless the prior art also suggests the desirability of the combination. In re Mills, 916 F.2d 680, 16 USPQ2d 1430 (Fed. Cir. 1990)

Application No.: 09/796,235
Filed:          02/28/2001
Group Art Unit: 2179

A statement that modifications of the prior art to meet the claimed invention would have been " 'well within the ordinary skill of the art at the time the claimed invention was made' " because the references relied upon teach that all aspects of the claimed invention were individually known in the art is not sufficient to establish a prima facia case of obviousness without some objective reason to combine the teachings of the references. Ex parte Levengood, 28 USPQ2d 1300 (Bd. Pat. App. & Inter. 1993). See also In re Kotzab, 217 F.3d 1365, 1371, 55 USPQ2d 1313, 1318 (Fed. Cir. 2000)

MPEP 2141.01(a) - While Patent Office classification of references and the cross-references in the official search notes of the class definitions are some evidence of "nonanalogy" or "analogy" respectively, the court has found "the similarities and differences in structure and function of the inventions to carry far greater weight." In re Ellis, 476 F.2d 1370, 1372, 177 USPQ 526, 527 (CCPA 1973)

To establish prima facie obviousness of a claimed invention, all the claim limitations must be taught or suggested by the prior art. In re Royka, 490 F.2d 981, 180 USPQ 580 (CCPA 1974). "All words in a claim must be considered in judging the patentability of that claim against the prior art." In re Wilson, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970). If an independent claim is nonobvious under 35 U.S.C. 103, then any claim depending therefrom is nonobvious. In re Fine, 837 F.2d 1071, 5 USPQ2d 1596 (Fed. Cir. 1988).

If the proposed modification or combination of the prior art would change the principle of operation of the prior art invention being modified, then the teachings of the references are not sufficient to render the claims prima facie obvious. In re Ratti, 270 F.2d 810, 123 USPQ 349 (CCPA 1959) (Claims were directed to an oil seal comprising a bore engaging portion with outwardly biased resilient spring fingers inserted in a resilient sealing member. The primary reference relied upon in a rejection based on a combination of references disclosed an oil seal wherein the bore engaging portion was reinforced by a cylindrical sheet metal casing. Patentee taught the device required rigidity for operation, whereas the claimed invention required resiliency. The court reversed the rejection holding tha "suggested combination of

Application No.: 09/796,235
Filed: 02/28/2001
Group Art Unit: 2179

references would require a substantial reconstruction and redesign of the elements shown in [the primary reference] as well as a change in the basic principle under which the [primary reference] construction was designed to operate." 270 F.2d at 813, 123 USPQ at 352.).

Distilling an invention down to the "gist" or "thrust" of an invention disregards the requirement of analyzing the subject matter "as a whole." W.L. Gore & Associates, Inc. v. Garlock, Inc., 721 F.2d 1540, 220 USPQ 303 (Fed. Cir. 1983), cert. denied, 469 U.S. 851 (1984)

In determining the differences between the prior art and the claims, the question under 35 U.S.C. 103 is not whether the differences themselves would have been obvious, but whether the claimed invention as a whole would have been obvious. Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 218 USPQ 871 (Fed. Cir. 1983); Schenck v. Nortron Corp., 713 F.2d 782, 218 USPQ 698 (Fed. Cir. 1983)

A prior art reference must be considered in its entirety, i.e., as a whole, including portions that would lead away from the claimed invention. W.L. Gore & Associates, Inc. v. Garlock, Inc., 721 F.2d 1540, 220 USPQ 303 (Fed. Cir. 1983), cert. denied, 469 U.S. 851 (1984)

## Claim Rejections - 35 U.S.C. §103

There are four aspects to considering the claim rejections: 1) understanding the nature of the prior art references; 2) considering the appropriateness of combining prior art references or specific features thereof; 3) assessing the anticipatory power of the prior art used for rejection, particularly what remains unanticipated; 4) examining the specific logic for rejection on a claim-by-claim basis.

### *Prior art references used for 35 U.S.C. §103 rejections*

One cannot appreciate a prior art reference as anticipatory without understanding it holistically: the nature of the problem being solved and solution provided, namely function and

Application No.: 09/796,235
Filed:          02/28/2001
Group Art Unit:  2179

structure. Similarly, one cannot consider the appropriateness of combination without checking alignment of principles of operation.

### 5,598,557 (Doner) - Getting highly relevant results from a coherent database

...searching and retrieving files in a database without a user being required to provide keywords or query terms. A user first selects and opens a reference file... Relevant files are prioritized and displayed to the user in groups... The groups of retrieved files are displayed in associating with the subject word they are relevant to. (abstract)

Doner required user selection of a topically-coherent target database for searching.

To conduct a search, a user first specifies a particular database. Databases are usually organized so that files stored on a particular database share a common attribute. For example, an attorney might utilize a database containing cases from a particular jurisdiction; a doctor might consult a database containing files of patient histories; a marketing manager might access a database containing product reviews for spotting market trends; etc. The database can be an already existing database or a newly created database. (4:65-5:5)

Doner's database is indexed for rapid searching, a typical technique.

Finally, the processed information is indexed and saved to the database, step 207.

In the most relevant embodiment to the claimed invention, Doner allowed user-specified search based upon a user-selected reference file, in lieu of directly inputting search terms (the other option for specifying search parameters):

Once a database has been selected, the user can select a weighted keyword search, a weighted Boolean search, or a document agent search. (5:21-23)

Alternatively, a user can opt for a Document Agent Search, which allows the user to initiate a search for documents which are similar to a reference document selected by the user. First, the user selects and opens a reference document. Next, the user selects the Document Agent Search option from the Search pull-down menu. (6:14-18)

Doner did mention networking: "Finally, computer system 100 can be a terminal in a computer network (i.e., a LAN)" (4:60-62), suggesting that the target database may be on a networked computer.

Application No.: 09/796,235
Filed:           02/28/2001
Group Art Unit: 2179

Doner displayed results. Doner did not, as Examiner asserted, anticipate augmenting a directory as claimed.

### 2003/0195877 (Ford) - Finding products for sale

Ford aimed at e-commerce shopping convenience by finding and displaying all products for sale based upon user-input search terms.

One problem currently encountered by online merchants is the inability to effectively present groups of related products that span the predefined categories. [0004]

Ford solved the problem of trying to provide inclusive results by accessing multiple databases.

The web site includes a query server that processes queries by searching a number of databases. [0027]

Ford's technology did not search the Internet per se, but instead an indexed database of data gleaned from a spider crawl. This approach is ubiquitous with so-called Internet search sites/engines that offer a user quick search results.

The Product Spider database 147 is generated through the use of a web crawler 160 that crawls web sites on the Internet 120 while storing copies of located web pages. The output of the web crawler 160 is input to a product score generator 162 that assigns a numerical score ("product score") to each web page based upon the likelihood that the page offers a product for sale for either online or offline purchase. [0034]

Ford did not search documents as claimed, but pre-digested database index records, the same as Doner.

As noted above, the Product Spider database 147 is indexed by keyword 166. Each keyword in the database is associated with one or more web pages for which the indexer 164 has determined an association. [0037]

Ford's explanation of the derivation of the databases, including the Product Spider database, is at [0030]-[0031] and [0034]-[0037].

As Ford was concerned with the web environment, particularly product searching, searching is necessarily user-interactive. The user inputs both search terms, and sets the scope of the search (search location(s)).

Exh. p. 10

Application No.: 09/796,235
Filed:        02/28/2001
Group Art Unit: 2179

Alternatively, users may search for products using a search engine interface 220.
Users can perform searches with the search engine interface 220 by typing in the
desired information (referred to herein as a "query") into a query window 230 and
then clicking on a search initiation button 240. The user may control the scope of the
search with a pulldown window 250 containing multiple categories. The search may
be limited to any one category through selection of that category from the pulldown
menu 250. Alternatively, the user may conduct a broad-based search through
selection of an "All Products" option 260. [0040]

    When the user submits a query from the search engine interface 220 of FIG. 2 to
the web site 130, the query server 140 applies the query to the database, or
databases, corresponding to the search scope selected by the user. [0046]

    Given the utility of Ford's interactive product searching, where keywords are few, one
would never think having to create a reference document to initiate a search. Ford certainly
didn't.

    Ford's real problem is not making search easy for the user (it already is), but being
properly inclusive: namely, showing all products for sale, but not referencing sources that don't
offer the desired product for sale.

### 6,353,822 (Lieberman) - recommending web pages via user profiling

    Lieberman profiled a user's interests by tracking web page selection and consumption
(reading time spent) while browsing the Internet. Recommendations of other web pages were
made by a contemporaneous background search, using search terms from the profile.

    The present invention operates in tandem with a conventional document-retrieval
facility, such as a web browser, by tracking the choices made by the user in retrieving
and viewing items (such as web pages)—i.e., which links are followed, when searches
are initiated, requests for help, etc.—and, based thereon, identifying additional items
likely to be of interest to the user. In other words, the invention browses the same
search space as the user, but faster and guided by the user's past behavior. (3:52-60)

    Liberman's technology searched the Internet for documents, similarly as the claimed
technology. Neither Lieberman nor the claimed technology offers the same as the quick-
response search engine Ford employed. Creating Ford's Product Spider database is a huge

Exh. p. 11

Application No.: 09/796,235
Filed: 02/28/2001
Group Art Unit: 2179

undertaking, requiring massive storage, not something a client computer would do, as opposed to the technology of Lieberman or that claimed herein.

### Prior Art Combination

The prior art references used by the Examiner for rejection do not themselves suggest combination. Examiner provided no logical motivation for combining the specific features used for rejection by using the prior art as a touchstone of rationale.

### Doner and Ford - Doner's reference document with Ford

For claims 9-17, 21-24, 27-29, Examiner combined Doner and Ford for rejection. Specifically, Examiner wanted to combine a specific feature of Doner's with Ford: allowing a user to select a reference document as a basis for search, in lieu of directly inputting search terms.

Search specification using Ford's process is quite simple: a specific product, so Doner's technique of simplifying search by using a reference document would be inappropriate in combination with Ford. There is no reason to think that a user would find it harder to type in "lawnmower" than select a reference document containing the same word; quite the contrary. Besides lack of self-suggestion within the prior art, not only is there no motivation to combine Doner's reference document with Ford's disclosed process, as Examiner contended, but the idea is counter-intuitive, and hence that specific feature combination constitutes impermissible hindsight.

Ford and Doner combined fail to anticipate other crucial claim limitations, as described below in the section titled: "Unanticipated limitations for all claims".

### Lieberman with either Doner or Ford

The background of the 09/796235 specification briefly mentions search engines. The specification glossed over the different construction of search engines and search sites, as that technology itself was already well known to those skilled in the art. With all due respect, now facing rejection over confusion, some elucidation is required.

Lieberman performed ad hoc Internet document searching based upon a user profile of previously tracked input.

Application No.: 09/796,235
Filed:            02/28/2001
Group Art Unit:  2179

Module 102 conducts the actual searches for candidate web items through web interface 50, which performs the mechanical tasks of accessing network 31 and retrieving items. (6:5-8)

With regard of ad hoc document searching, Lieberman and the claimed technology are equivalent. Lieberman used a database to store found documents, an unnecessary elaboration in using 09/796235 technology, but Lieberman's searching was of documents on the web. Lieberman and the claimed technology could easily tap into commercial search engines/sites, such as Google, for results, as suggested in the background of the 09/796235 specification, or in Lieberman 8:4-16.

Significantly different, Ford and Doner performed user-interactive database searches, relying upon user input for both search parameters and search scope/location.

Doner's anticipated a database that is self-constructed.

The database can be an already existing database or a newly created database. FIG. 2 is a flowchart illustrating the steps for creating a new database. Computer files containing useful information can be imported by copying it over to the database, step 201. Moreover, data in the form of documents, reports, magazine and newspaper articles, can be entered either manually by means of a keyboard, step 202, or they can be entered by using an optical scanner, step 203. Moreover, the data can already exist on the computer system. The user can specify zones of a scanned image or file which is of particular significance for further processing, step 204. Textual portions of a scanned bit-map image or file can be recognized and converted into ASCII code data, step 205. The ASCII code data can then be edited, step 206. Finally, the processed information is indexed and saved to the database, step 207. (5:5-20)

In contrast to Doner, a different approach is Ford's Product Spider database, which resembles commercial search sites such as Google, A9, Alta Vista, Yahoo, and others. Here, a web crawler collates pages (or, at the least, page references) into a database, as well as creating an index record of keywords for each page. A user search doesn't actually go the web, but instead to the index of database records that comprise page links and their associated keywords.

The Product Spider database 147 includes information about independent web sites, unaffiliated with the host web site 130, that have been identified as offering products for sale. This database is particularly useful in that it allows the host web-site

Exh. p. 13

Application No.: 09/796,235
Filed:            02/28/2001
Group Art Unit:   2179

130 to help a consumer find product offerings for products that are not sold by the host web site 130 or by affiliated on-line merchants. [0030]

The nature of the problem, function and structure of Lieberman's ad hoc web document searching and the claimed invention differs markedly from the database index searching of Doner or Ford.

Examiner provided no explanation of logical connectivity between these references that could be grounded within the prior art itself, so as to make a Lieberman-Doner/Ford combination proper under the 35 U.S.C. §103 guidelines, applicable to the claimed invention.

Appellant respectfully traverses rejection of claims 18-22, and 27, combining Lieberman with Ford or Doner, as constituting impermissible hindsight.

### *Unanticipated limitations for all claims*

#### *"…without user input"*

Respectfully, Examiner disavowed plain-meaning claim language in the preamble applicable to all claims: "augmenting a directory without user input". Examiner considered claim 9 as exemplary.

Stating that a search and retrieval computer system "augments a directory" "without user input" could be interpreted in many ways. Search and retrieving computer files have many steps, including entering search criteria, search locations and the minutia performed by the computer to determine whether a computer file meets the search criteria and is retrieved. (01/26/2005 office action, pp. 27-28)

Examiner's "many ways" of interpreting "without user input" comes down to two aspects of potential user input:

  1. search parameters/terms/criteria, and

  2. search location(s).

Examiner's mention of " the minutia performed by the computer" is irrelevant to user input.

With all due respect, in context, Examiner's argument of vagueness with regard to "without user input" was an insupportable straw man.

page 13 of 22

Application No.: 09/796,235
Filed:          02/28/2001
Group Art Unit:  2179

So, Examiner overtly disagreed, but tacitly concurred with appellant, that, in context, the two limitations applicable to the meaning of "without user input" comprise:

1. no user input of search parameters;

2. no user input of search locations.

That is exactly what appellant had explained in his 08/27/2004 reply to the first office action rejection.

Appellant had amended claim 9 to explicitly point out "without user input of search location" as a claim limitation in the body of the claim. While on the one hand complaining about the preamble "without user input" limiting the scope of a claim, on the other hand, Examiner on page 28 of his 01/26/2005 office action inexplicably inferred a nefarious intent to stating an aspect of this limitation, "without user input of a search location", within the body of the claim.

None of the cited prior art references meet both aspects of the limitation "without user input". Particularly, Ford and Doner take user input of both search parameters and location. Doner in one embodiment allows user selection of a reference document in lieu of inputting search terms, but that still constitutes user input, albeit indirect input of search terms.

Lieberman created a user profile based upon tracking user input as a means for building search parameters. Relative to the claimed invention, Lieberman's was an active and tedious process of data collation from user input.

By contrast, the claimed invention relies solely upon documents in a directory, without relying upon user input. Yes, a user must first put the documents in the directory, but that is a precondition; user input is not required for the claimed process to work, unlike Lieberman. That cannot be said for Doner, Ford, Lieberman, search engines, or any other cited art used as a basis of rejection.

### *"augmenting a directory" (all claims)*

Doner, Ford, and Lieberman all display results interactively. No cited prior art teaches augmenting a directory with found relevant references as a process termination as claimed.

Respectfully, Examiner's mistaken attributions with regard to the cited prior art adding results to a file directory are traversed.

Exh. p. 15

Application No.: 09/796,235
Filed:          02/28/2001
Group Art Unit: 2179

### *"documents in storage"*

The nature of "documents" as used in context throughout the claims and 09/796,235 specification is consistent and singular. In the claims, the same type of document is used for deriving search parameters, search, and results references, hence the same term: "document". Documents are individual files in storage, to which a reference may be made and used for access, as in a file pointer or hyperlink or URL (universal resource locator). Technically, from an access perspective, a document is always file system pointer/reference, as the file system may maintain a document in fragments on physical storage, collating the fragments and delivering the contents only upon request by software yielding a file pointer.

Ford and Doner searched databases, not documents as claimed.

Documents in a file system storage are not the same as database records.

One simply could not describe a technology that relies upon a database and not use the word "database". The word database does not appear in the 09/796,235 specification.

With all due respect, Examiner oversimplified Ford's disclosed process. Ford used a spider to create an indexed database of spider-found web pages, the fruit of a "search engine". Ford's user-interactive search was conducted on a database index, not the documents themselves. User interactivity would be severely compromised if a user had to await the results of a broad search of Internet documents in real-time. All known quick-response Internet search engines, Ford's included, take a moving snapshot of the Internet, predigesting web pages into a indexed database, then search the index upon user request input. The explanation and quotations provided describing Ford verify this process, and hence refute Examiner's assertion. So, Ford did not anticipate the plain literal meaning of the claim limitation "searching a plurality of documents". Examiner's contention that Ford searched documents is respectfully traversed.

Doner's search parameter reference document, which may be the same type of document as claimed, is not the same structure as the database record index searched, or a search result database record (albeit derived from a document).

Yes, Lieberman searched documents through the Internet, and displayed document references, but Lieberman relied upon a user-input derived profile for search parameters, not documents as claimed.

Application No.: 09/796,235
Filed:          02/28/2001
Group Art Unit: 2179

Owing to different natures of the problem, functions and structures, as argued foregoing, Lieberman cannot be combined with Doner or Ford without impermissible hindsight, as the prior itself provides no teaching, suggestion, or motivation.

### *Specific Claim Rejections*

The foregoing arguments about unanticipated limitations applies in respectfully traversing rejection of all claims.

The foregoing arguments about the impermissible prior art combination of Lieberman with Doner or Ford apply to claim 18 and its dependents (claims 19-22).

Besides whatever specific arguments are presented below, all dependent claims rely one or more unanticipated limitations within their respective base claim for novelty.

### *Claim 9*

Examiner: "Doner discloses a method for augmenting a directory without user input". This assertion is respectfully traversed. First, Doner displayed results; Doner never suggested augmenting a directory. Second, Doner required user input, both in input of search parameters (either directory by inputting search terms, or indirectly by selecting a reference document from which search terms are derived), and in selection of a database to search.

Examiner conceded that "Doner fails to disclose: searching a plurality of documents in storage in at least one computer *without user input of a search location.*"

Examiner: "Ford teaches a method for augmenting a directory." This assertion is respectfully traversed. Ford displayed results; Ford never suggested augmenting a directory.

Perhaps mistakenly mixing up Ford with Doner, Examiner contended that Ford taught the limitation of accessing a first document comprising context from which keywords are derived, an assertion respectfully traversed. Ford did not teach this limitation. The evidence Examiner presented with regard to Ford did not address this issue, and there is no such evidence to be found within Ford.

Doner taught using a reference document for keyword extraction as a prelude for search, though this required user selection of the document, and thus failed to meet the limitation in the preamble of accessing a first document *without user input.*

Application No.: 09/796,235
Filed:          02/28/2001
Group Art Unit:  2179

Further, as aforementioned, it would have been non-obvious to apply Doner's reference document approach for search parameters to Ford.

Examiner contended that Ford taught the limitation of "searching a plurality of documents in storage in at least one computer without user input of a search location". Respectfully traversed, Ford neither searched documents, nor did so without user input of a search location. Ford searched databases, not documents, as did Doner. Further, Ford stated, as quoted in full above, that searches are performed "corresponding to the search scope selected by the user".

### Claim 12

Examiner contended that Doner disclosed the limitation in claim 12 of accessing a plurality of documents for derivation of keywords for search. The contention is respectfully traversed.

In one embodiment, Doner disclosed user selection of a single reference document as a base for keyword derivation. Doner made no suggestion of user selection of multiple such documents. Further, just having user selection fails to anticipate the limitation of operation without user input.

### Claim 15

Examiner contended that Doner disclosed checking enable of directory augmentation. Examiner explained that "Doner discloses this limitation in that the system determine (sic) whether the database includes relevant documents".

Examiner's assertion is respectfully traversed. With all due respect, Examiner misconstrued Doner in light of the claim limitations. First, Doner did not anticipate augmenting a directory. Second, Doner 6:13-65 stated nothing with regard to checking an enablement option as to whether to search for results.

### Claim 17

Again, Examiner contended that Ford taught augmenting a directory, an assertion respectfully traversed.

With all due respect, Examiner was grossly mistaken in referring to the Internet as a "dynamic database". The dispersed Internet is no database. Respectfully, this statement belies understanding the technical nature of databases or the Internet, and calls into question Examiner's objectivity and/or technical competence.

<div align="center">page 17 of 22</div>

Application No.: 09/796,235
Filed:             02/28/2001
Group Art Unit:  2179

Databases comprise records adherent to a particular data structure, which are commonly indexed, as with Ford and Doner, and thus organized. The Internet is a network affording access to documents lacking any organization with regard to consistency in data structure. HTML, the common format of web pages, provides a page layout formatting mechanism; not at all the same as a data structure imposed by a database.

### Claim 18

Based upon foregoing argument, appellant respectfully traverses Examiner's assertion that "Doner discloses an apparatus for augmenting a directory without user input".

Database index records taught by Doner and Ford are not document files. Respectfully, Examiner repeatedly confused the two as being the same. Please see the above section about "documents in storage".

As argued foregoing, respectfully traversing Examiner's assertion, no cited prior art, Doner especially, suggested adding a document reference to a search results directory.

Respectfully, in rejecting claim 18, Examiner combined Doner with Lieberman, along with Internet search engines, in a gumbo of impermissible hindsight.

### Claim 23

Again, Examiner contended that Ford and Doner taught augmenting a directory, an assertion respectfully traversed. No cited prior art, neither Doner nor Ford particularly, suggested adding a document reference to a search results directory.

With all due respect, as described foregoing, Examiner mischaracterized Ford with regard to Ford searching the Internet per se. A web crawler does not search in the literal sense, and anyway Ford did not disclose crawling upon user invocation. A web crawler is a collation mechanism for database storage, and the database subsequently searched, as Ford disclosed.

### Claim 28

Examiner contended that Ford's web crawl constituted a search for documents as claimed. With all due respect, Appellant posits this as a failure of appreciation regarding specific processes.

Ford performed a two-step process: first, a web crawl to populate a database, resulting in creating indexed records from the web pages gleaned in the crawl, where each record

Exh. p. 19

Application No.: 09/796,235
Filed:          02/28/2001
Group Art Unit: 2179

comprised keywords extracted from a web page, along with a link to the page; second, an actual user search was of the database records index, not of documents in storage across a network as claimed.

**Claim Objections**

Appellant takes no umbrage to amending the claims to meet Examiner's claim objections; in fact, thanks Examiner for such careful attention to detail; but poses the following comment.

"How to Write a Patent Application" by Jeffrey Sheldon is a well respected tome on the subject. "this book is highly recommended..." gushed the National Council of Intellectual Property Law Associations Newsletter. One chapter of Sheldon's book covers claim language.

Claim 9 & 23 - replacing "such that" with "wherein". According to Sheldon, "such that" indicates achieving a functional relationship, whereas "wherein" "is used to modify or qualify a previously introduced element". "such that" in claim 9 & 23 was used to establish a functional relationship: that searching by keyword (second element) was functionally related to searching documents (first element). Appellant considers "wherein" less specific, and thus less appropriate, in the particular instances where used.

Appellant does not request an oral hearing.

The $250.00 fee per 37 C.F.R. § 1.17 (c) for filing this appeal brief is enclosed as a separate credit card form. Please charge any additional fees that may be required in connection with filing this appeal brief and any extension of time, or credit any overpayment, to the credit card on the enclosed credit card form. Thank you.

Respectfully submitted,

Gary Odom

15505 SW Bulrush Lane, Tigard, OR 97223

telephone:   (503) 524-8371
fax:         (775) 942-8525
date:        February 14, 2005

Exh. p. 20

Application No.: 09/796,235
Filed:        02/28/2001
Group Art Unit: 2179

## 9. APPENDIX

1-8. (canceled)

9. (previously presented) A method for augmenting a directory without user input comprising the following steps:

accessing at least a first document via a first directory,

said first document comprising at least in part topical textual content;

deriving at least one first keyword indicative of at least one topical content within said first document;

searching a plurality of documents in storage in at least one computer without user input of a search location,

such that searching for documents related by said keyword to said first document,

thereby retrieving a second document;

determining relevance of said second document to at least said first keyword;

adding a reference to said second document in a results directory.

10. (previously presented) The method according to claim 9, wherein said storage is at least in part on a different computer than the computer storing said first directory.

11. (previously presented) The method according to claim 9, wherein deriving a plurality of keywords and determining relevance to a plurality of keywords.

12. (previously presented) The method according to claim 9, wherein accessing a plurality of documents in said first directory.

13. (previously presented) The method according to claim 9, with the additional steps of deriving a plurality of keywords and ranking at least two said keywords.

14. (previously presented) The method according to claim 9, with the additional step of signifying the relevancy of said second document to documents in the first directory when displaying said results directory.

15. (previously presented) The method according to claim 9, with the additional step of checking enablement of said augmentation.

page 20 of 22

Application No.: 09/796,235
Filed:          02/28/2001
Group Art Unit: 2179

16. (previously presented) The method according to claim 9, with the additional step of comparing the relevance of said second document to a preset threshold for determining said augmentation.

17. (previously presented) The method according to claim 9, wherein said results directory is said first directory.

18. (previously presented) An apparatus for augmenting a directory without user input, said apparatus comprising:

  means for accessing at least a first document via a first directory, said first document comprising at least in part topical textual content;

  means for deriving at least one first keyword indicative of at least one topical content within said first document;

  means for searching documents in storage in at least one computer,

  wherein at least some said documents are independent and not organized in relation to one another,

  wherein said search means comprising searching for documents related by said keyword to said first document;

  means for retrieving a second document resultant from said search means;

  means for determining relevance of said second document to at least said first keyword;

  means for adding a reference to said second document in a results directory;

  means for displaying said directories.

19. (previously presented) The apparatus according to claim 18, wherein said storage comprises a plurality of computers connected to at least one network.

20. (previously presented) The apparatus according to claim 18, with additional means for deriving a plurality of keywords

  and means for determining relevance of said second document to a plurality of keywords.

21. (previously presented) The apparatus according to claim 18, with additional means for comparing the relevance of said second document to a preset threshold for determining said augmentation.

22. (previously presented) The method according to claim 18, wherein said results directory is said first directory.

Application No.: 09/796,235
Filed:              02/28/2001
Group Art Unit:  2179

23. (previously presented) A method for augmenting a directory without user input, said method comprising the following steps:

accessing a plurality of grouped documents;

deriving a plurality of keywords indicative of the aggregate content of said grouped documents;

prioritizing the relative relevance of said keywords;

storing said keywords and said relevance prioritization;

searching a plurality of documents in storage in at least one computer,

such that searching for documents related by at least one said keyword to said stored keywords,

whereby retrieving a second document;

determining relevance of said second document to said plurality of stored keywords;

adding a reference to said second document in a results directory.

24. (previously presented) The method according to claim 23, with the additional step of comparing the relevance of said second document to a preset threshold for determining said augmentation.

25. (canceled)

26. (canceled)

27. (previously presented) The method according to claim 9, wherein said storage comprises a plurality of computers connected to at least one network.

28. (previously presented) The method according to claim 23, wherein said storage comprises a plurality of computers connected to at least one network.

29. (previously presented) The method according to claim 9, with the additional step of displaying said results directory.

30. (canceled)

31. (previously presented) The apparatus according to claim 18, with additional means for not adding a reference to a retrieved document to said results directory if said retrieved document had previously been deleted from said results directory.